USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1811 UNITED STATES, Appellee, v. FRANCIS BOOTS, Defendant, Appellant. ____________________ No. 94-1812 UNITED STATES, Appellee, v. ELLWYN COOK, Defendant, Appellant. ________________ No. 94-1813 UNITED STATES, Appellee, v. DEWEY LAZORE, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________ ____________________ Before Stahl, Circuit Judge, _____________ Campbell, Senior Circuit Judge,  ____________________ and Lynch, Circuit Judge. _____________ ____________________ Robert A. Costantino, for appellant Francis Boots. ____________________ Ronald Cohen, for appellant Ellwyn Cook. ____________ Stephen R. Kaplan, for appellant Dewey Lazore. _________________ Margaret D. McGaughey, with whom Jay P. McCloskey, United States _____________________ ________________ Attorney, was on brief for appellee. ____________________ March 29, 1996 ____________________ CAMPBELL, Senior Circuit Judge. In this _______________________ consolidated appeal, defendants-appellants Francis Boots, Ellwyn Cook, and Dewey Lazore challenge their convictions for conspiracy, in violation of 18 U.S.C. 371, to commit three offenses, and their convictions of the substantive offenses: 1) to devise a scheme or artifice using the wires in interstate commerce with intent to defraud Canada and the Province of Nova Scotia of excise duties and tax revenues, in violation of 18 U.S.C. 1343; 2) to devise a scheme or artifice to deprive the residents of the Passamaquoddy Reservation in Maine of the honest services of their police chief, in violation of 18 U.S.C. 1343 and 1346; and 3) to travel interstate with the intent to facilitate bribery, a crime under Maine state law, in violation of 18 U.S.C.  1952. Judgment was entered in the United States District Court for the District of Maine following a jury trial. I. Facts I. Facts Construed in the light most favorable to the government, the evidence indicates that between April and November 1992, defendants took part in a scheme to transport tobacco from a Native American reservation in upstate New York ("Akwasasne") into New Brunswick, Canada, without paying the taxes and excise duties levied upon the importation of tobacco by Canadian laws. The tobacco was transported -3- 3 surreptitiously into Canada through the Passamaquoddy Reservation in Pleasant Point, Maine, bypassing customs checkpoints at the Canadian border.  At the trial, Passamaquoddy Tribe member Anthony Stanley testified that on April 15 he was called to discuss some tobacco business by Beverly Pierro, a friend of his friend, Francis Boots. Later that day, Stanley approached his friend Frederick Moore, who was then serving as chief of police of the Passamaquoddy Tribe ("the Tribe") at Pleasant Point. Stanley told Moore that two Mohawks from Akwasasne were in Calais, Maine and wanted to meet with him that evening to discuss "mov[ing] tobacco." Moore (who was familiar with Akwasasne from having spent time there twelve years earlier at an Indian solidarity demonstration1) agreed to meet. However, unknown to Stanley, Moore then contacted a law enforcement officer at the Bureau of Indian Affairs (BIA) for advice and received a go-ahead to see what the two Mohawks wanted. The four -- Stanley, Moore, Cook, and Lazore -- met that evening at a motel. It could be found from the evidence that Cook and Lazore knew that Moore was a police chief.2  ____________________ 1. The terms "Native American," "Indian," and "aboriginal" used herein are taken from the defendants' briefs and testimony. 2. Stanley testified that when Moore asked in their initial phone call whether the two knew that he was a police chief, Stanley said yes. Moore testified that at the evening -4- 4 The two said that they wanted to bring tobacco from Akwasasne to Passamaquoddy and sell it to Moore and Stanley, who would profit by selling it to established markets in New Brunswick, Canada. Moore declined to purchase their tobacco, but said he would listen further to their objectives and the price they would pay for his involvement.  Cook explained that the aim was to transport tobacco "unmolested by either government." He indicated that they could not transport the tobacco themselves because their names were known. The group proceeded to discuss law enforcement efforts on the reservation, possible border crosspoints, a storage place for the tobacco, and the potential for growth in their trading activities, with Moore's help and his recruitment of others. Cook offered to pay Moore $20 per case of tobacco transported. Moore said that he would think about the proposal and reply within a week. At the end of the meeting, he was given some tobacco which he split with Stanley.  ____________________ meeting he was not in uniform, but was wearing a baseball hat that had the insignia of the Pleasant Point Police Department on it. He admitted that the two defendants never stated at the meeting that they were approaching him because he was a police chief. However, Moore testified that he told them he was armed and was a cop. The four also specifically discussed law enforcement on the reservation, in response to Lazore's inquiry about whether they had anything to fear from police officers. The following day, Lazore and Cook saw Moore when he was in uniform in his police cruiser and waved to him from their car. -5- 5 Moore updated his contact at BIA and the next day agreed to work undercover for the Federal Bureau of Investigation (FBI). The following week he went with agents of the FBI and Royal Canadian Mounted Police (RCMP) to view possible offloading sites near St. Andrews, New Brunswick, Canada. Moore took Stanley to some of the same places later in the month. Defendants Cook and Lazore next met with Moore, Stanley, Pierro, and her boyfriend, Jake Boots (brother of defendant, Francis Boots) on April 28, 1992. They discussed navigation routes and law enforcement concerns, among other matters. Moore told the group that he had access to the schedules and communications of most of the law enforcement agencies. They met again the next day, and Moore took Pierro and Jake Boots by boat from the Passamaquoddy Reservation to the Canadian shore while explaining points about navigation. The first tobacco delivery was made on May 2. Defendants Cook, Lazore, and Francis Boots, along with Pierro and Jake Boots, brought 50 cases of tobacco to Stanley's house, where they met Moore. Moore supplied a boat and navigated it to St. Andrews with Stanley and Jake Boots. They met two contacts who paid them $1000, which Stanley and Moore split (Moore giving his share to the FBI). Moore made similar deliveries across the border accompanied by Stanley, -6- 6 Jake Boots, or both on May 11, May 16, and June 27. Moore and Stanley attempted to deliver tobacco on June 1, but returned with the cases because their Canadian contact did not show. Moore delivered tobacco on June 9, accompanied by an FBI and border agent. No deliveries were made between July and November due to the incarceration of a key contact, Stanley Johnson. Moore and Jake Boots, assisted by Pierro, made the last delivery on November 7.3 Moore testified that, in all, almost 1850 kilograms of tobacco were transferred across the Canadian border.4 The government's expert on Canadian taxes stated that the total per kilogram tax on tobacco was $106.47 Canadian.5 He inferred that taxes had not been paid, because the packages were not stamped as is customarily done. The wire fraud and conspiracy counts in the indictment alleged that wires were used in furtherance of a scheme to defraud Canada and the Province of Nova Scotia of tobacco taxes due. To establish this element, the government introduced evidence of four  ____________________ 3. Anthony Stanley, Beverly Pierro, Jake Boots, and Stanley Johnson were also charged with various offenses, and entered guilty pleas during the trial. 4. Omitting the June 9 transfer by Moore and law enforcement agents, the amount transferred was 1500 kilograms. 5. This sum includes an excise duty of $18.33, excise tax of $35.64, and a provincial excise tax of $52.50. -7- 7 interstate telephone conversations between Moore and Pierro from May 1992 through July 1992.  During the period of tobacco deliveries, Moore (at the FBI's request) did not disclose his role to the tribal governor, who supervised him.6 The tribal governor learned of Moore's activity in late June, when Stanley brought it to the attention of the tribal council. Moore was suspended on June 25 without pay and was later dismissed in August for neglect of duty and insubordination. He testified that he believed the dismissal was not a result of his tobacco trading activities, but rather related to an investigation of the tribal governor. Boots and Cook argued, in defense, that they pursued the above activities with a good faith belief in an aboriginal right to trade tobacco freely with Canada. This belief was based upon their adherence, as members of the Ganiengehaga Nation, to a constitution called the "Great Law of Peace," and on the fact that their reservation, Akwasasne, includes lands in New York State, Ontario, and Quebec. The two defendants testified that they recognized neither a formal border between the United States and Canada nor a Canadian right to tax the sacred product of tobacco, though  ____________________ 6. For his investigatory work, Moore received from the federal government $350 per week between August and mid- December, a $25,000 payment in December, and various expenses. -8- 8 they admitted they were aware that Canada claimed such a right and imposed such imposts. Boots maintained that he believed the shipped tobacco was intended for an Indian market in Canada. He further stated that Moore was hired because of his navigational skills and not because of his statusas thePassamaquoddy policechief. Lazore didnot testify. II. Discussion II. Discussion Defendants assert on appeal that the district court erred in the following ways: 1) in refusing to dismiss the indictment or grant a judgment of acquittal, on the ground that a "scheme to defraud" Canadian authorities of duties and taxes is not cognizable under the wire fraud statute; 2) in finding the Maine bribery statute, which provided the basis for the Travel Act violation, applicable to Moore as police chief of a Native American reservation; 3) in denying a judgment of acquittal on the wire fraud counts charging a scheme to deprive Passamaquoddy Tribe members of the honest services of their police chief, despite alleged interference of the federal statute with tribal sovereignty; and 4) in refusing to include their specific version of a good faith defense in the jury instructions. They claim that their convictions of conspiracy and independent statutory -9- 9 violations must be reversed because of these errors. Defendant Boots also challenges his sentence.7 A. Wire Fraud: Scheme to Defraud Canada of Duties A. Wire Fraud: Scheme to Defraud Canada of Duties and Taxes and Taxes The indictment charged a wire fraud violation in the conspiracy count and four independent counts upon the theory that defendants intended to defraud Canada and the Province of Nova Scotia of tobacco duties and taxes, using or causing the wires to be used interstate in furtherance of  ____________________ 7. Lazore argues that the district court erred in denying a motion to dismiss the indictment based on lack of jurisdiction to prosecute Native Americans for transporting tobacco into Canada, a right claimed to be protected by the Jay Treaty. He relies on language in Article III of the Treaty of Amity, Commerce and Navigation (1794) between the United States and Great Britain, which provided:  [N]or shall the Indians passing or repassing with their own proper goods and effects of whatever nature, pay for the same any impost or duty whatever. But goods in bales, or other large packages, unusual among Indians, shall not be considered as goods belonging bona fide to Indians. The Jay Treaty, Nov. 19, 1794, U.S.-Gr.Brit., 8 Stat. 116, 118. The government has argued persuasively that this argument grounded in the Jay Treaty was waived by defendants' failure to press it sufficiently in the district court. In any event, we discern no error in the lower court proceedings on this ground. See generally Karnuth v. United States ex ______________ _______ ________________ rel. Albro, 279 U.S. 231, 239 (1929) ("[T]he privilege ___________ accorded by article 3 is one created by the treaty, having no obligatory existence apart from that instrument, . . . . It is, in no sense, a vested right. It is not permanent in its nature. It is wholly promissory and prospective, and necessarily ceases to operate in a state of war. . . ."); Akins v. United States, 551 F.2d 1222, 1229-1230 (C.C.P.A. _____ _____________ 1977) (duty exemption of Jay Treaty was abrogated by the War of 1812, and though similar language was incorporated in federal tariff acts until 1897, upon repeal of that last act no such language preserving the right was reenacted thereafter). -10- 10 this scheme. The relevant telephone communications took place between Pierro and Police Chief Moore on May 25, May 31, June 7, and July 24, 1992.8 The government's evidence supports a reasonable inference that the calls were made between Maine and New York, where Moore and Pierro resided. Defendants argue that the district court erred in denying their motion to dismiss based on the government's alleged failure to show a proper "scheme to defraud" as section 1343 requires.9 Defendants insist, inter alia, that _____ ____ (1) they made no affirmative misrepresentation to Canadian ___________ customs authorities relative to their tobacco trading activities; and (2) their scheme had as its object no protected property interest within the wire fraud statute.   ____________________ 8. Defendants need not personally use the wires as long as such use was a reasonably foreseeable part of the scheme in which they participated. See United States v. Maze, 414 U.S. ___ _____________ ____ 395, 399 (1974); Pereira v. United States, 347 U.S. 1, 8-9 _______ _____________ (1954). 9. The wire fraud statute provides: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both . . . . 18 U.S.C. 1343.  -11- 11 We turn first to defendants' insistence that the absence of any affirmative misrepresentation -- such as a ___________ false customs declaration -- rendered their smuggling activities non-fraudulent for wire fraud purposes. The government responds that scheming to bypass Canadian customs authorities and not to declare the tobacco was a sufficient form of deceit to meet the requirements of section 1343.10 Cf. United States v. Brewer, 528 F.2d 492, 496 (4th Cir. ___ _____________ ______ 1975) (scheme to sell cigarettes into another state without registering with tax officials there, as required by Jenkins Act, is mail fraud); see also McEvoy Travel Bureau, Inc. v. ________ ___________________________ Heritage Travel, Inc., 904 F.2d 786, 791 (1st Cir.), cert. ______________________ _____ denied, 498 U.S. 992 (1990) ("the scope of fraud under these ______ [federal fraud] statutes is broader than common law fraud, and . . . no misrepresentation of fact is required").  We see no need, however, to decide whether a smuggling scheme structured like the instant one, if  ____________________ 10. Counts 1 and 18 through 21 charged that defendants devised a scheme in violation of Sections 236 & 240(1), of the Excise Act, Revised Statutes of Canada, 1985, Ch. E-14 and amendments thereto; Sections 155 & 160 of the Customs Act, Revised Statutes of Canada, 1985 (2d Supp.) Ch. 1; Section 25(1)(a) of the Tobacco Tax Act, Ch. 470 of the Revised Statutes of Nova Scotia, 1989 and amendments thereto; and Section 7 of the Health Services Tax Act, Ch. 198 of the Revised Statutes of Nova Scotia, 1989.  Part II of the Customs Act imposes an obligation on importers to declare dutiable goods and pay any taxes or duties imposed by other laws relating to customs. -12- 12 practiced upon, say, federal or other authorities within the United States, would be a fraudulent scheme within section 1343. Even assuming it would be, we face the separate problem that the object of the scheme here was exclusively to defraud a foreign government, rather than our own, of customs and tax revenues imposed under foreign law. We believe this added factor pushes defendants' scheme beyond the parameters of the frauds cognizable under section 1343. The prosecution, relying on cases upholding wire and mail fraud convictions for schemes to evade domestic taxes, argues that customs and tax revenues, even though owed solely to a foreign governmental body under laws of the latter's making, constitute money and property for purposes of the wire and mail fraud statutes.11 See, e.g., United _________ ______ States v. Dale, 991 F.2d 819, 849 (D.C. Cir.) (federal tax ______ ____ revenues), cert. denied, 114 S. Ct. 286 and 114 S. Ct. 650 ____________ ___ (1993); United States v. Helmsley, 941 F.2d 71, 93-95 (2d _____________ ________ Cir. 1991) (state income taxes), cert. denied, 502 U.S. 1091 ____________ (1992); United States v. Bucey, 876 F.2d 1297, 1309-1310 (7th _____________ _____  ____________________ 11. The Supreme Court has held that only frauds affecting the government's interests as property holder come within section 1343, see Carpenter v. United States, 484 U.S. 19, 25 ___ _________ _____________ (1987); McNally v. United States, 483 U.S. 350, 358 n.8 _______ ______________ (1987) (mail fraud), although Congress has since criminalized schemes to deprive another of the intangible right to honest services as well, see 18 U.S.C. 1346 (effective November ___ 18, 1988), infra. The Court has analyzed mail and wire fraud _____ offenses similarly, because they share the same relevant statutory language. See Carpenter, 484 U.S. at 25 n.6. ___ _________ -13- 13 Cir.) (federal income taxes), cert. denied, 493 U.S. 1004 _____________ (1989); see also Otto G. Obermaier & Robert G. Morvillo, ________ White Collar Crime 9.02[1] at 9-30 n. 64 (1994) (federal ___________________ and state tax cases).  But none of the prosecution's cited wire fraud cases have involved a scheme to deprive a foreign government _______ of its own taxes and similar exactions.12 The prosecution urges that section 1343 should apply, because it does not  ____________________ 12. A somewhat similar factual pattern arose, but went undecided, in this circuit in a civil context in Nodine v. ______ Textron, Inc., 819 F.2d 347 (1st Cir. 1987).  _____________ The case that is perhaps most factually analogous to the present -- though not particularly helpful here -- is United States v. Gafyczk, 847 F.2d 685 (11th Cir. 1988), ______________ _______ which involved a scheme to import cigarettes into the United States and to export them, repackaged with other materials in mislabeled containers, into Italy without paying duties owed there. The charges there included violations of 49 U.S.C.  121 (falsely making a bill of lading), 18 U.S.C. 1001 (making a false statement in a matter within the jurisdiction of a U.S. government agency or department [the U.S. Customs Service]), and 18 U.S.C. 371 (conspiring to defraud the United States). Neither wire nor mail fraud was charged; however, the court of appeals relied on McNally in _______ interpreting the "intent to defraud" element of section 121 to require that the government assert a pecuniary or property interest which was the target of the fraud. See id. at 689- ___ ___ 690. Defendants' convictions on these counts were reversed for failure to show such an interest. See id. ("It is clear ___ ___ that such a deprivation could have occurred if the _____ appellants' actions had been even partially intended to evade the payment of export duties or other levies properly owed to the United States.") (emphasis supplied). The court added that "the fact that the evidence may well have established the appellants' intent to defraud Italy is of no import _____ because that nation is not identified as the object of the effort to defraud in violation of 49 U.S.C.App. 121" as alleged in the indictment. Id. at 690 (emphasis supplied). ___ The court expressed no opinion as to whether such a theory would have been viable under section 121 (let alone under the federal fraud statutes, to which section 121 was compared). -14- 14 describe any particular type of victim of a scheme to defraud. It punishes use of the wires in interstate or foreign commerce in furtherance of "any scheme or artifice to defraud." If domestic tax fraud falls under section 1343, why not foreign revenue frauds as well, it is contended. Federal wire prosecutions have been based on frauds against private foreign businesses and individuals. See, e.g., __________ United States v. Lewis, 67 F.3d 225 (9th Cir. 1995) ______________ _____ (reversing wire fraud conviction for a scheme to defraud a foreign bank where the jury instruction did not charge a property interest as the target of the scheme); United States _____________ v. Van Cauwenberghe, 827 F.2d 424 (9th Cir. 1987) (affirming ________________ wire fraud conviction involving scheme to defraud a Belgian investment broker and corporation), cert. denied, 484 U.S. ____________ 1042 (1988). However, schemes aimed at depriving a foreign government of duties and taxes are not the same as domestic tax frauds, nor are they even the same as private commercial frauds aimed at foreign business entities or individuals. At issue is not only whether "money or property," as such, is being targeted, but more importantly here, the extent to which constitutional and prudential considerations factor into our analysis. Foreign customs and tax frauds are intertwined with enforcement of a foreign sovereign's own laws and policies to raise and collect such revenues -- laws -15- 15 with which this country may or may not be in sympathy and over which, in any event, we have no authority. In recognition of this, our courts have traditionally been reluctant to enforce foreign revenue laws. The "revenue rule" -- a firmly embedded principle of common law, traced to an opinion by Lord Mansfield, Holman v. Johnson, 98 Eng. Rep. ______ _______ 1120 (K.B. 1775) -- holds that courts generally will not enforce foreign tax judgments, just as they will not enforce foreign criminal judgments, although they will enforce foreign non-tax civil judgments unless due process, jurisdictional, or fundamental public policy considerations interfere. See Restatement (Third) of Foreign Relations  ___ 483 & n.1 (1987); see also Banco Nacional de Cuba v. _________ _________________________ Sabbatino, 376 U.S. 398, 448 (1964) (White, J., dissenting) _________ ("[O]ur courts customarily refuse to enforce the revenue and penal laws of a foreign state, since no country has an obligation to further the governmental interests of a foreign sovereign.") (footnote omitted); Her Majesty the Queen in ___________________________ Right of the Province of British Columbia v. Gilbertson, 597 __________________________________________ __________ F.2d 1161, 1164-1165 (9th Cir. 1979). The rationale of the revenue rule has been said to be that revenue laws are positive rather than moral law; they directly affect the public order of another country and hence should not be subject to judicial scrutiny by American courts; and for our courts effectively to pass on such laws raises issues of -16- 16 foreign relations which are assigned to and better handled by the legislative and executive branches of government. Although this case does not require us to enforce a foreign tax judgment as such, upholding defendants' section 1343 conviction would amount functionally to penal enforcement of Canadian customs and tax laws. The scheme to defraud at issue -- proof of which is essential to conviction -- had as its sole object the violation of Canadian revenue laws. To convict, therefore, the district court and this court must determine whether a violation of Canadian tax laws was intended and, to the extent implemented, occurred. In so ruling, our courts would have to pass on defendants' challenges to such laws and any claims not to have violated or intended to violate them. Where a domestic court is effectively passing on the validity and operation of the revenue laws of a foreign country, the important concerns underlying the revenue rule are implicated. Of particular concern is the principle of noninterference by the federal courts in the legislative and executive branches' exercise of their foreign policymaking powers. National policy judgments made pursuant to that authority could be undermined if federal courts were to give general effect to wire fraud prosecutions for schemes of this type aimed at violating the revenue laws of any country. It is noteworthy that the federal statute criminalizing the smuggling of goods into -17- 17 foreign countries punishes such activities only if the foreign government has a reciprocal law. See 18 U.S.C.  ___ 546. A decision to uphold the present convictions would have the effect of licensing prosecutions against persons who use the wires to engage in smuggling schemes against foreign governments irrespective of whether a particular government had the reciprocal arrangement called for in section 546. In the case of Canada, to be sure, we cannot say that this specific legislative judgment would be undermined by affirming the instant wire fraud conviction.13 We do not condone defendants' smuggling activities, nor do we question Canada's revenue laws or the desirability of cooperation in respect to our mutual border. But application of the wire fraud statute to a scheme of this type does not, and cannot, turn upon our attitude towards Canada alone. The revenue rule has not risen or fallen over the centuries based on country-by-country judicial assessments of the potential  ____________________ 13. The United States has a treaty with Canada to exchange information about smuggling across the border. See ___ Convention to Suppress Smuggling, June 6, 1924, U.S.-Can. (ratified by Great Britain), 44 Stat. 2067. Yet a cursory search has failed to make it clear whether a violation of Canadian revenue or tax laws would be grounds for extradition of the violator to Canadian authorities, suggesting some doubt as to the degree of cooperation mutually promised. See ___ Treaty on Extradition, Dec. 3, 1971, U.S.-Can., 27 U.S.T. 983. We have not made a close examination into the extent of Canada's reciprocal arrangements such as are contemplated under 18 U.S.C. 546. Even assuming Canada were to qualify, we see nothing in the wire fraud statute that would allow us to limit the statute to wire frauds practiced against the revenue laws of nations having reciprocal arrangements. -18- 18 for a foreign relations conflict. Courts are neither equipped nor constitutionally empowered to make such assessments. Prosecutors, who operate within the executive branch, might of course be expected not to pursue wire fraud prosecutions based on smuggling schemes aimed at blatantly hostile countries, but whether conduct is criminal cannot be a determination left solely to prosecutorial discretion. Rather, the longstanding rule instructs the courts to leave this area alone, so that the legislative and executive branches may exercise their authority and bargaining power to deal with such issues, and also so that a foreign government's revenue laws are not subjected to intrusive scrutiny by the courts of this country.  It is true that the existence of a more specific penal statute, such as the current anti-smuggling statute, 18 U.S.C. 546, would not be deemed impliedly to preempt the general federal anti-fraud statutes if effect could comfortably be given to both. See, e.g., United States v. _________ _____________ Brien, 617 F.2d 299, 310 (1st Cir.) (holding that Commodities _____ Futures Trading Act does not preempt or impliedly repeal wire or mail fraud statutes and citing related cases), cert. _____ denied, 446 U.S. 919 (1980); Brewer, 528 F.2d at 498 ______ ______ ("[Defendant's] use of the mails to escape regulation added a different element and a new dimension to her failure to comply with the [Jenkins] Act."). Effect, however, cannot be -19- 19 given to section 1343 in these conditions without threatening the reciprocity provision in section 546, and offending generally the salutary principles underlying the revenue rule. If Congress, notwithstanding these inherent tensions, had meant to authorize the courts to enforce this kind of application of the wire fraud statute, we think "it must speak more clearly than it has." McNally, 483 U.S. at 360. _______ Our conclusion is further supported by the rule of lenity, which holds that the harsher of two possible readings of a criminal statute will be enforced only when Congress has spoken clearly. See id. at 359-360; Fasulo v. United States, ___ ___ ______ _____________ 272 U.S. 620, 629 (1926) ("[B]efore one can be punished [for mail fraud], it must be shown that his case is plainly within the statute."). We, therefore, hold that foreign tax and customs frauds, such as the instant one, are not schemes to defraud within the meaning of section 1343, and that defendants' substantive convictions of wire fraud under section 1343, based on the scheme to defraud Canada and Nova Scotia of duties and taxes, must be reversed. Our holding that it was legal error to apply the wire fraud statute to defendants' Canadian smuggling scheme requires us to set aside the conspiracy conviction under 18 U.S.C. 371 as well. Jurors "are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law," though they are generally able -20- 20 to analyze evidence and recognize a theory that is factually inadequate. Griffin v. United States, 502 U.S. 46, 59 _______ ______________ (1991); United States v. Nieves-Burgos, 62 F.3d 431 (1st Cir. _____________ _____________ 1995) ("Griffin distinguishes cases, like [Turner v. United _______ ______ ______ States, 396 U.S. 398 (1970)], which concern convictions that ______ may have rested on a basis that was not supported by the evidence, from those concerning convictions possibly resting on an invalid ground as a result of an error of law [such as in Yates v. United States, 354 U.S. 298 (1957)]). The _____ ______________ district court instructed the jury that it could convict under section 371 if the government proved beyond a reasonable doubt that defendants conspired to commit at least one of the three offenses charged as objects of the conspiracy. Because it is impossible to tell which ground the jury based the conspiracy conviction upon, the conviction cannot stand. See Yates, 354 U.S. at 312. ___ _____ The government contends that even if the wire fraud count falls, the conspiracy conviction should be affirmed based on at least one of the two other objects alleged. Since the jury found substantive violations of those statutes, the argument goes, we should infer that it unanimously found beyond a reasonable doubt that the conspiratorial agreement extended, with respect to all defendants, to at least one legally sufficient object. This contention might be persuasive where a district court does -21- 21 not give a "one-is-enough" charge, or a special verdict form is required of the jury, such that the reviewing court is not speculating on what the jury did or did not decide. Here, however, it is at least possible that the jury did not ask itself whether the conspiratorial agreement extended to the two valid objects (interstate travel with intent to commit bribery, and a scheme to defraud another of honest services) with respect to all defendants, instead focusing on the overall conspiratorial agreement to transport tobacco into Canada without paying taxes and duties. Cf. United States v. ___ _____________ Carman, 577 F.2d 556, 567-568 (9th Cir. 1978) ("If the jury, ______ when considering the conspiracy count, focused only on the crime embodied in the subsequently overturned substantive crime conviction the conspiracy conviction also should be overturned. . . . Criminal sanctions cannot rest on what an appellate court thinks the jury would have done had the issues put to it been framed differently."); see also United ________ ______ States v. Palazzolo, 71 F.3d 1233 (6th Cir. 1995) (where ______ _________ defendants were convicted of substantive offenses that were also objects of a conspiracy, and district court gave erroneous instruction on one offense, court reversed conspiracy conviction because "the verdict lends itself at least to the possibility that the jury found the defendants guilty only of conspiring to violate" the legally inadequate count); United States v. Musacchia, 955 F.2d 3 (2d Cir. ______________ _________ -22- 22 1991). Further, the two legally sufficient objects of the conspiracy were not so intricately intertwined with the invalid wire fraud count that we can necessarily say that the conspiracy conviction had a legally correct basis. Cf. ___ United States v. Huebner, 48 F.3d 376 (9th Cir.) ("Under the ______________ _______ facts in this case, it would not have been possible for the jury to have found a conspiracy to aid and abet attempted [tax] evasion without also finding a conspiracy to defraud the United States by obstructing [tax] collection. . . . [T]here could be no danger that the jurors based their conspiracy verdict on finding that the object was to aid and abet attempted evasion without also finding that the object was to defraud the United States by obstructing collection."), cert. denied, 116 S. Ct. 71 (1994). The ____________ conspiracy conviction is vacated and that count is remanded for further proceedings not inconsistent with this opinion, which may, in the prosecution's discretion, include a new trial on a properly narrowed indictment. See Yates, 354 U.S. ___ _____ at 327-328; Palazzolo, 71 F.3d at 1238; United States v. _________ ______________ Ochs, 842 F.2d 515, 529 (1st Cir. 1988). ____ B. Maine Bribery Statute as a Basis for Violation B. Maine Bribery Statute as a Basis for Violation of the Travel Act of the Travel Act We turn next to the substantive counts of interstate travel to facilitate bribery, a crime under Maine law, in violation of 18 U.S.C. 1952 and 2. The Interstate Travel Act punishes "[w]hoever travels in interstate or -23- 23 foreign commerce . . . with intent to . . . promote, manage, establish, carry on, or facilitate . . . any unlawful activity, and thereafter performs or attempts to perform" such an act. 18 U.S.C. 1952(a). Bribery in violation of state law is an "unlawful activity" within section 1952. See ___ United States v. Arruda, 715 F.2d 671, 681 (1st Cir. 1983). _____________ ______ The Maine bribery statute, charged here, provides in relevant part: 1. A person is guilty of bribery in official and political matters if: A. He promises, offers, or gives any pecuniary benefit to another with the intention of influencing the other's action, decision, opinion, recommendation, . . . or other exercise of discretion as a public servant. . . .  ___________________ 17-A M.R.S.A. 602(1)(A) (emphasis supplied). "Pecuniary benefit" means economic gain, including money or property. Id. 602(2)(C). ___ Defendants were convicted of traveling between New York and Maine during the spring of 1992 with intent to carry on and facilitate the bribery of Moore, whom they knew was the police chief of the Passamaquoddy Reservation, and thereafter performing and causing to be performed acts to facilitate bribery, and aiding and abetting the offense. Evidence was presented that Cook and Lazore gave Moore tobacco at the end of their first meeting on April 15 (at which he was offered payment for his involvement); Cook paid Moore $1000 (Canadian) for the tobacco delivery on May 2; -24- 24 Boots paid Moore $600 for the delivery on May 16; and defendants discussed with Moore concerns with law enforcement on the reservation and elsewhere which might interfere with their objectives.14 Defendants challenge their convictions for Travel Act violations on two principal grounds: 1) Moore, as police chief of the Passamaquoddy Indian Reservation, was not, they argue, a "public servant" within the meaning of the Maine bribery statute, supra; and 2) even if a public servant, his _____ official duties did not include enforcing Canadian or federal laws and thus were not influenced.15 We do not find merit in either contention. "Public servant" is defined in the Maine criminal code as "any official officer or employee of any branch of government and any person participating as juror, advisor, __________ consultant or otherwise, in performing a governmental ____________________________  ____________________ 14. The indictment charged that Pierro arranged for additional payments totaling $3000 to Moore between May and mid-September of 1992. The record indicates that Cook's original offer of $20 per carton was not precisely carried out, as Moore and Stanley usually were to share the payments. 15. Defendants also contend that it was legally impossible for Moore to have been bribed after June 25, 1992, when he was suspended from office. We agree with the government that this claim does not get defendants far, since the relevant dates for the Travel Act violations preceded his suspension. Defendants have not challenged the Travel Act charge other than to attack the predicate crime of bribery in violation of state law. -25- 25 function." Id. 2(21) (emphasis supplied). "Government," ________ ___ in turn, is defined as: the United States, any state or any county, municipality or other political unit within territory belonging to the State, the United States, or any department, agency or subdivision of any of the foregoing, or any corporation or other association carrying out the functions of government or formed pursuant to interstate compact or international treaty.  Id. 2(13). Whether the foregoing definitions encompass the ___ police chief of the Passamaquoddy Tribe at Pleasant Point requires consideration of the Tribe's legal relationship with the State of Maine. That relationship is spelled out in the federal Maine Indian Claims Settlement Act of 1980, 25 U.S.C. 1721-1735 ("Settlement Act"), which ratified Maine's Act to Implement the Maine Indian Claims Settlement, 30 M.R.S.A. 6201-6214 ("Maine Implementing Act"). See Passamaquoddy ___ _____________ Tribe v. State of Maine, 75 F.3d 784, 787 (1st Cir. 1996); _____ ______________ Couturier v. Penobscot Indian Nation, 544 A.2d 306 (Me. 1988) _________ _______________________ (the purpose of the Implementing Act was "to serve as a basic, organic document establishing the broad and basic provisions of the relationship between the State and the Maine Indians"). Under these acts, the Passamaquoddies are declared to be "subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person . . . therein" unless otherwise provided. 30 M.R.S.A. 6204; see also 25 U.S.C.  _________ -26- 26 1725(b)(1) (approving the jurisdictional scope set forth in the Maine Implementing Act). However, the Maine Implementing Act also grants powers and duties to the Tribe comparable to those of a municipality (in addition to special authority to regulate internal tribal matters). See 30 M.R.S.A. 6206(1) ___ ("Except as otherwise provided in this Act, the Passamaquoddy Tribe . . . shall have, exercise and enjoy all the rights, privileges, powers and immunities, . . . and shall be subject to all the duties, obligations, liabilities and limitations of a municipality of and subject to the laws of the State"); id. 6206(2) (granting a tribe, its officers, and employees ___ immunity from suit when "the respective tribe . . . is acting in its governmental capacity to the same extent as any municipality or like officers or employees thereof within the State"); Penobscot Nation v. Stilphen, 461 A.2d 478, 488 (Me. ________________ ________ 1983). Tribe-appointed law enforcement officers "possess the same powers and are subject to the same duties, limitations and training requirements as other corresponding law enforcement officers under the laws of the State." 30 M.R.S.A. 6210(4). These powers include shared authority for enforcing state laws within Indian territories (except for laws, not applicable here, over which a tribe may have exclusive jurisdiction). See id. 6210(4).  ___ ___ The Maine legislature has thus explicitly equated, in most respects, the powers and obligations of tribes and -27- 27 tribal law enforcement officers with those of municipalities and corresponding law enforcement officers. See Couturier, ___ _________ 544 A.2d at 308 (tribes share the immunity of municipalities under the Maine Tort Claims Act by operation of section 6202 of the Maine Implementing Act, and this immunity extends to a tribe-appointed police officer acting in a governmental capacity). Since a law enforcement officer employed by a municipality would undoubtedly qualify as a "public servant," see 17-A M.R.S.A. 2(13) & 2(21), so too, we believe, would ___ a tribe-appointed law enforcement officer. The definition of "public servant" extends, in any event, to a person (whether or not an official officer or employee) "participating as juror, advisor, consultant or otherwise performing a governmental function." Id. 2(21). Moore was charged with ___ enforcing state laws and tribal ordinances within the reservation. We think he fits, therefore, rather easily within the Maine statute's definition of public servant. Defendants' reliance upon United States v. Tonry, _____________ _____ 837 F.2d 1281 (5th Cir. 1988) is misplaced. Tonry may _____ initially appear analogous, because it involved charges of conspiracy to violate and substantive violation of the Travel Act based on interstate travel with intent to bribe the chairman of an Indian tribe. However, unlike the instant case which involves defining "public servant" under Maine law, the sole question resolved by the Fifth Circuit was -28- 28 whether the tribal chairman was a "private fiduciary" under Louisiana's Commercial Bribery Statute. Defendants call attention to Tonry because the court indicated that the _____ tribal chairman was not a Louisiana public official within the meaning of another statute targeting public bribery. Yet ______ in that case, the government conceded that issue, given the particular statutory scheme. Here, in contrast, the Maine criminal code defines "public servant" quite broadly using a functional measure, which is notably absent from the public __________ bribery law referred to in Tonry. More importantly, Maine's _____ criminal laws operate against the backdrop of the Settlement Act which ratified the Maine Implementing Act. See Penobscot ___ _________ Nation, 461 A.2d at 489 ("It was generally agreed that the ______ acts set up a relationship between the tribes, the state, and the federal government different from the relationship of Indians in other states to the state and federal governments."). Defendants cannot expect the jurisdictional burdens on the Tribe resulting from these acts to "disappear merely because they have become inconvenient." Passamaquoddy _____________ Tribe, 75 F.3d at 794.16  _____  ____________________ 16. We similarly dismiss Cook's assertion that the bribery of Moore to facilitate smuggling operations from New York to Maine and into Canada is an internal tribal matter protected from federal and state interference. Cook offers no statutory support for interpreting the relevant provision of the Maine Implementing Act this broadly, and indeed, the case law is to the contrary. See 30 M.R.S.A. 6206(1) ___ ("[I]nternal tribal matters, including membership in the respective tribe or nation, the right to reside within the -29- 29 Defendants also challenge the predicate state bribery violation on the ground that Moore's official duties excluded enforcing federal or Canadian law and thus could not be influenced. As noted, the statute prohibiting bribery in official matters punishes one who "promises, offers, or gives a pecuniary benefit with the intention of influencing the ___________________________________ other's action, decision, . . . or other exercise of ______ ________ ___________________ discretion as a public servant." 17-A M.R.S.A. 602(1)(A) _______________________________ (emphasis supplied). The jury could find on the evidence presented that, as police chief, Moore was responsible for general surveillance of the reservation, and that defendants selected him, in part, with the intention that he divert other officers on the reservation from patrolling areas of smuggling activity. Cf. State v. Beattie, 129 Me. 229, 151 ___ _____ _______ A. 427 (1930) (defendant charged with bribing county sheriff to refrain from seizing liquor and arresting person making an unlawful sale). Moore testified that he normally would have referred smuggling activity to the local district attorney's office and pursued the matter further if so directed. He also testified to having a mutually beneficial working  ____________________ respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income shall not be subject to regulation by the State."); Penobscot Nation, 461 A.2d at 490 (holding that ________________ operation of beano games is not an internal tribal matter, for "the term embraces only those matters illustratively listed in the statute and other matters like them," having historical cultural importance).  -30- 30 relationship with Canadian authorities which included exchanging information. It may be conceded that his duties did not formally include enforcing federal or Canadian law. But an honest municipal police officer would be expected to keep his eyes open for and report federal and, in present circumstances, even foreign criminal violations; receiving something of value to turn a deliberate blind eye would limit his discretion in his official capacity as tribal police chief.  Defendants' related contention that they recruited Moore simply because of his navigational skills and not his status as police chief is undermined by substantial evidence showing that they were aware of Moore's status and concerned with law enforcement activities from the first meeting onward. We conclude that bribery was a legally sufficient foundation for the Travel Act violations, and therefore affirm those convictions. C. Wire Fraud: Scheme to Defraud of Honest C. Wire Fraud: Scheme to Defraud of Honest Services Services A third substantive offense, related to the bribing of the police chief, was that defendants devised a scheme to defraud the residents of the Passamaquoddy Reservation at Pleasant Point of the honest services of their police chief and knowingly caused the wires to be used in interstate commerce in furtherance of the scheme, in violation of 18 -31- 31 U.S.C. 1343 and 1346.17 Defendant Lazore asserts, without development, that the district court should have issued a judgment of acquittal on these counts in deference to tribal sovereignty. The government responds that tribes are, in any event, subordinate to the federal government. While neither side spells out the dispute, we understand it to be principally a jurisdictional one, namely, that the federal government lacks authority to prosecute defendants on a matter involving internal relations of the Passamaquoddy Tribe. The Supreme Court has stated that while Indian tribes are "'unique aggregations possessing attributes of sovereignty over both their members and their territory,'" "[t]heir incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they have previously exercised." United States v. Wheeler, 435 _____________ _______ U.S. 313, 323 (1978) (quoting United States v. Mazurie, 419 _____________ _______ U.S. 544, 557 (1975)). The tribes generally retain the right to self-government, id. at 322, but are nonetheless subject ___ to federal criminal jurisdiction of both a specified and more general nature. See generally United States v. Markiewicz, _____________ ______________ __________  ____________________ 17. Our reversal of the convictions for violating section 1343, supra, does not resolve the challenge here, which is _____ based upon the distinct theory of scheming to "deprive another of the intangible right to honest services." 18 U.S.C. 1346. -32- 32 978 F.2d 786, 797-802 (2d Cir. 1992) (discussing federal criminal jurisdiction over offenses committed by or against an Indian or on Indian territory, as well as over "peculiarly Federal" offenses), cert. denied, 506 U.S. 1086 (1993).  ____________ The statutory violations charged under 18 U.S.C.  1343 and 1346 are not specific to Native Americans, but rather are of general applicability. Cf. Wheeler, 435 U.S. ___ _______ at 330 n.30 ("Federal jurisdiction also extends to . . . crimes over which there is federal jurisdiction regardless of whether an Indian is involved, such as assaulting a federal officer, 18 U.S.C. 111 (1976 ed.)."). The latter crimes may involve "an independent federal interest to be protected," id. at 331 n.32, though it is unclear that one is ___ required. Compare Markiewicz, 978 F.2d at 800, with United _______ __________ ____ ______ States v. Begley, 42 F.3d 486, 500 (9th Cir. 1994) (a Native ______ ______ American may be charged under a federal criminal statute of general applicability even absent a peculiarly federal interest, if charge is unaffected by federal enclave law and Native Americans have not been excluded from the statute's application), cert. denied, 116 S. Ct. 93 (1995). Wire fraud ____________ appears to belong to this category of general offenses that apply equally to Native Americans; even if an independent federal interest is required to support this application of the statute, the interest is to prevent use of the wires in interstate or foreign commerce in furtherance of a scheme to -33- 33 defraud. Cf. H.R.Rep. No. 94-1038, 94th Cong., 2d Sess. 3 ___ (1976), reprinted in 1976 U.S.C.C.A.N. 1125, 1127 (noting in ____________ legislative history of the Indian Major Crimes Act [18 U.S.C. 1153], which prescribes federal jurisdiction over 13 specified offenses, that federal criminal jurisdiction also extends to "crimes that are peculiarly Federal. . . . such as assaulting a federal officer . . . or defrauding the United States"); see also United States v. Funmaker, 10 F.3d 1327, ________ _____________ ________ 1331 (7th Cir. 1993) (18 U.S.C. 844(i), punishing one who destroys by fire property used in or affecting interstate commerce, extends to a Native American who set fire to tribe- owned gambling hall); United States v. Finn, No. CRIM. 5-95- _____________ ____ 12(01), -12(02), -12(03), 1995 WL 783305 at *16-*22 (D. Minn. Oct. 12, 1995) (denying motion to dismiss for lack of jurisdiction an indictment charging officers of tribal corporation with mail fraud in violation of 18 U.S.C. 1341 and 1346 and other offenses).  As discussed earlier, the United States has an interest in preventing use of the wires in interstate commerce to further a scheme to defraud, including one to "deprive another of the intangible right to honest services" under section 1346. Defendant has not shown, and we do not discern, how the application of sections 1343 and 1346 in this case would interfere with any Native American right protected by statute or treaty, or right integral to self- -34- 34 government.18 Cf. Funmaker, 10 F.3d at 1332 ("The ___ ________ decision-making power of Indian tribes ends . . . at the point when those decisions would violate federal law designed to safeguard important federal interests such as the free flow of interstate commerce."). The convictions for violations of section 1346, in conjunction with section 1343, are affirmed.  D. Jury Instruction on Good Faith Defense D. Jury Instruction on Good Faith Defense Defendants challenge the district court's refusal to give a proposed instruction to acquit on wire fraud if the jury found "that the defendant had a good faith belief that his status as a Native American entitled him to freely pass the United States-Canadian border without paying any form of taxes on the goods he was carrying." The proposed instruction would not have required the jury to find, as the district court instructed instead, that their good faith belief was "objectively reasonable." We need not decide the challenge to the jury instruction, because the wire fraud convictions based on the scheme to defraud Canadian authorities of taxes and duties have been reversed.   ____________________ 18. While Congress has removed federal jurisdiction to enforce certain federal statutes involving Indian-related offenses in the State of Maine, wire fraud laws are not so included. See 25 U.S.C. 1725(c) (removing federal criminal ___ jurisdiction over sections 1152 through 1156, 1160, 1161, and 1165 of Title 18). -35- 35 True, charges under a second theory of wire fraud (depriving citizens on the reservation of the honest services of their police chief) have been affirmed. If refusing to give the proposed instruction relating to aboriginal rights were error, it might have infected the jury's assessment of defendants' intent on these additional counts as well. However, defendants' argument is grounded in the first theory of wire fraud alone; they say that to the extent that this case is about having the specific intent to violate Canadian tax laws, it is analogous to certain federal tax offense cases, in which an instruction that good faith must be "objectively reasonable" is inappropriate. See Cheek v. ___ _____ United States, 498 U.S. 192, 203 (1991). Given our reversal ______________ of the tax-related charges, defendants' initially weak contention is not even arguably tenable. In any case, the district court went beyond the legal minimums in instructing the jury that it could consider good faith as a defense. Cf. ___ Dockray, 943 F.2d at 155 ("[W]here the court properly _______ instructs the jury on the element of intent to defraud -- essentially the opposite of good faith -- a separate instruction on good faith is not required.").  E. Sentencing of Boots E. Sentencing of Boots Boots challenges his sentence, which, like Cook's and Lazore's, was at the low end of the applicable guideline sentencing range: 18 months imprisonment, to be followed by -36- 36 two years of supervised release.19 Mandatory special assessments were imposed. Boots raises four sentencing issues. 1. Downward Departure 1. Downward Departure Boots contends first that the district court erred in refusing to grant a downward departure. He acknowledges the general rule that jurisdiction does not lie for appeals from a district court's discretionary decision not to depart downward. See United States v. Tardiff, 969 F.2d 1283, 1290 ___ _____________ _______ (1st Cir. 1992). However, he seeks to fit within the exception for a refusal to depart based upon a court's "misapprehension of the rules governing departures." United ______ States v. Gifford, 17 F.3d 462, 473 (1st Cir. 1994).  ______ _______ The exception is a narrow one, and is not met here. A review of the sentencing transcript reveals that the district court judge was well aware of the applicable case law, believed he had authority to depart downward, and declined to do so after carefully weighing the arguments presented. His discretionary judgment that the case did not involve such unusual circumstances to justify taking it  ____________________ 19. The guideline range was determined as follows: a base offense level of 6 pursuant to U.S.S.G. 2F1.1(a), 3D1.2(d), and 3D1.3(b); a seven-level increase for a loss between $120,000 and $200,000 pursuant to 2F1.1(b)(1)(H); and a two-level increase for an offense involving more than minimal planning pursuant to 2F1.1(b)(2)(A), for a total offense level of 15. With a criminal history category of I, the applicable range was 18 to 24 months. -37- 37 "outside the Guidelines' 'heartland,'" United States v. ______________ Rivera, 994 F.2d 942, 949 (1st Cir. 1993), was not skewed by ______ legal errors such as Gifford describes. It is therefore _______ unreviewable.  2. Acceptance of Responsibility 2. Acceptance of Responsibility Boots claims that the district court erred in refusing to grant him a two-point reduction for acceptance of responsibility for his offenses pursuant to U.S.S.G.  3E1.1(a). He says that at trial he did not contest the factual basis for the charges, but challenged only the jurisdictional bases, and should not be punished for exercising his constitutional right to a trial. We review for clear error the district court's decision that Boots did not "clearly demonstrate[] acceptance of responsibility" for his offense. U.S.S.G. 3E1.1(a); see ___ also United States v. Lombard, 72 F.3d 170, 187 (1st Cir. ____ _____________ _______ 1995). The district court declined to grant a reduction in part because it believed that if defendant had been solely concerned with jurisdictional issues relating to his Native American status, he could have entered a conditional guilty plea and preserved the issue for appeal rather than going to trial. The court also considered the fact that defendants defended against the bribery aspect of the case, insisting that the payments they offered Moore were not bribery but rather were salary for a business partner.  -38- 38 A district court's determination of whether such a reduction is warranted deserves "great deference." U.S.S.G.  3E1.1 comment. (n.5). We see no abuse of discretion here. Cf. United States v. Crass, 50 F.3d 81, 84 (1995) ("intent, ___ _____________ _____ ______ like any other essential element of the crime charged, may not be contested by the defendant without jeopardizing a downward adjustment for 'acceptance of responsibility'"); United States v. Springs, 17 F.3d 192, 196 (7th Cir.) (noting _____________ _______ that defendant who entered conditional guilty plea "was able to retain the right to challenge the voluntariness of his confessions, and he still received the maximum possible acceptance-of-responsibility reduction"), cert. denied, 115 _____________ S. Ct. 375 (1994). 3. More Than Minimal Planning 3. More Than Minimal Planning Boots challenges the two-level increase imposed pursuant to U.S.S.G. 2F1.1(b)(2) for offenses involving more than minimal planning. The Guidelines state that this increase applies where repeated acts are carried out over a period of time provided they were not "purely opportune," as well as where steps are taken to conceal the offense. See ___ U.S.S.G. 1B1.1 comment. (n.1(f)), 2F1.1(b)(2) comment. (n.2). The sentencing transcript reflects that the district court judge imposed this increase after considering the evidence of multiple acts taken by defendants over a several month period. Among the acts specifically noted was the -39- 39 bribery of Police Chief Moore, a concealed activity in which defendants directly participated in the spring of 1992. While the district court may reconsider this issue upon remand for resentencing in light of our reversal of the wire fraud and conspiracy convictions, it was not clear error to impose the increase. 4. Amount of Loss 4. Amount of Loss Boots claims that insufficient evidence supported the district court's calculation of the amount of loss (between $120,000 and $200,000), which resulted in a seven- level increase to defendants' sentences. The range was determined based on testimony at trial and sentencing as to the quantity of tobacco transported into Canada and the corresponding duties and taxes owed. Our reversal of the wire fraud count involving tobacco smuggling, and our vacating of the conspiracy count, require a remand for resentencing, at which time the district court may reconsider the entire question of loss calculations, including the instant issue. We see no need to deal further with this matter now. We have considered defendants' other arguments and find them to be without merit. The convictions for violations of 18 U.S.C. 1346 (wire fraud intended to deprive residents of honest services of their police chief) and 1952 (Travel Act) are affirmed. The violations of 18 ________ -40- 40 U.S.C. 1343 (wire fraud relative to Canadian duties and taxes) are reversed. The violation of 18 U.S.C. 371 ________ (conspiracy) is vacated and remanded for further proceedings _______ ________ not inconsistent with this opinion. We also vacate the sentences of all defendants and remand for resentencing consistent with this opinion. So ordered. __ ________ -41- 41