UNITED STATES, Appellee,

v.

F. William SAWYER, Defendant,
Appellant.

No. 95–1689.

United States Court of Appeals,
First Circuit.

Heard Nov. 7, 1995.

Decided May 30, 1996.

Thomas R. Kiley, with whom Carl Valvo, Steven H. Goldberg, Matthew L. Schemmel, and Cosgrove, Eisenberg & Kiley, P.C., were on brief, Boston, MA, for appellant.

Timothy W. Jenkins, Gary C. Adler, and O'Connor & Hannan, L.L.P., were on brief, Washington, DC, for State Government Affairs Council, amicus curiae.

Ralph D. Gants, Susan Murphy, and Palmer & Dodge, were on brief, Boston, MA, for The Massachusetts Association of Professional Lobbyists, amicus curiae.

Michael Kendall, Assistant United States Attorney, with whom Jonathan Chiel, Acting United States Attorney, and Amy Lederer, Assistant United States Attorney, were on brief, for appellee.

Before BOUDIN, Circuit Judge, ALDRICH, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

Appellant F. William Sawyer appeals his convictions for mail and wire fraud, interstate travel to commit bribery, and conspira-

cy to commit those offenses. The district court imposed a $10,000 fine, and sentenced him to imprisonment for twelve months and one day. In this appeal, Sawyer claims that the district court erred in its jury instructions and in evidentiary rulings, and that the evidence was insufficient to establish his guilt beyond a reasonable doubt. For the reasons that follow, we vacate the convictions and remand for further proceedings.

## I.

### Facts

Viewing the record in the light most favorable to the verdict, *United States v. Wihbey*, 75 F.3d 761, 764 (1st Cir.1996), a rational jury could have found the following facts from the trial evidence.

During the indictment period, 1986 to March 1993, the John Hancock Mutual Life Insurance Company ("Hancock") employed the defendant-appellant, F. William Sawyer, as a senior lobbyist within its Government Relations Department. As the largest life insurance company in Massachusetts, Hancock had a continuing and abiding interest in the state's insurance laws. Sawyer's job was to lobby the Massachusetts Legislature on Hancock's behalf. In particular, his job description required him to: research and develop Hancock's position on pertinent legislation; communicate relevant information to representative government officials in order to effect a favorable outcome and to protect the Company's interests; and establish and maintain relationships with legislators as well as with members of industry associations.

A principal focus of Sawyer's lobbying activities was the Legislature's Joint Insurance Committee ("Insurance Committee"), composed of state representatives and senators. The Insurance Committee has the ability to impact life insurance regulations more than any other legislative committee. To this end, it reviews approximately 300 bills per year, about fifty of which affect the life insurance industry. During each year of the indictment period, Massachusetts life insurance companies actively sought the passage of about five bills, most of which made it successfully through the Insurance Committee

"in some form or another." Robert J. Smith, a research analyst and director for the Committee, testified that, during the indictment period, Sawyer was one of three lobbyists who appeared most often to lobby for bills sought by the life insurance industry.

The Insurance Committee is co-chaired by a senate and house member, each with equal control over the fate of bills assigned to the Committee. The Chairs have the ability to schedule hearings, assign bills to the hearing calendar and subsequent executive sessions, advocate bills at executive sessions, and take other action to advance them through the Committee. Each Chair could "carry" a bill, *i.e.*, actively guide it through the Legislature as a whole; alternatively, a Chair could send it to the "Study Committee" which usually shelved it.

During the indictment period, Sawyer focused his lobbying activities on the house members of the Insurance Committee, some of whom took action that directly or indirectly affected Hancock's interests. Representative Francis H. Woodward was the House Chair of the Insurance Committee from 1986 to 1990. Research analyst Smith identified Sawyer as the lobbyist he saw most often with Representative Woodward during Woodward's tenure as the Committee's House Chair. During this time, the Insurance Committee never rejected Woodward's recommendations on bills affecting the life insurance industry and Woodward "carried" most of the bills sought by the industry. Representative Frank Emilio, a member from 1986 to 1990, sponsored a September 1990 bill on behalf of Hancock. Representative John F. Cox sponsored bills that Hancock supported in November 1990 and December 1991. In addition, Representatives Walsh, Mara, and Driscoll sponsored legislation sought by the life insurance industry.

"Legislative Reports" issued by the Hancock Government Relations Department to senior Hancock officers, and signed by Sawyer, outlined specific lobbying efforts and proceedings in the Massachusetts Legislature pertinent to Hancock's interests. In July 1990, Sawyer wrote a memorandum to Hancock's Management Committee summarizing the successful efforts of Hancock lobby-

ists, including himself, in excluding Hancock from a bill that would have subjected it to a $100–million tax liability. In a September 1990 memorandum to the Management Committee, Sawyer referred to a 1990 bill, filed by Representative Emilio, that allowed Hancock to assess and report its real estate advantageously. A November 1990 letter from Ralph F. Scott, Hancock's Assistant Legislative Counsel, to Representative Cox indicated that Sawyer and Scott planned to work with Cox in obtaining favorable action on a specific bill that he had sponsored for Hancock.

During the indictment period, Sawyer paid for numerous meals, rounds of golf, and other entertainment for and with Massachusetts legislators, including many members of the Insurance Committee. Although Sawyer initially paid for most of these activities himself, they were treated as business expenses and reimbursed by Hancock (hereinafter "expenditures"). In accordance with Hancock's procedures, Sawyer would complete monthly expense vouchers, attaching receipts and a handwritten calendar that identified the recipients of the expenses. Sawyer's supervisor, Raeburn B. Hathaway, the head of Hancock's Government Relations Department, reviewed Sawyer's expense vouchers and approved them for reimbursement. Hathaway's secretary would then detach the detailed calendars from the vouchers, keeping the calendars within the Government Relations Department, and forward the voucher, alone, to the accounting department for payment.

Analysis of Sawyer's expense vouchers and calendars during the indictment period revealed that the top three recipients of his expenditures were: Representative Woodward, who received more than $8,000 worth of expenditures during his tenure as Insurance Committee House Chair; Robert Howarth, an Insurance Committee member from 1986 to 1992 (over $3,000); and Representative Emilio (over $2,500). After these

three legislators left office, Sawyer, on behalf of Hancock, expended practically nothing on entertaining them (Woodward, $0; Howarth, $8.33; and Emilio, $85.65).

Specifically, Sawyer's expenditures included thousands of dollars for golf—in and out of state—with various Massachusetts legislators including Representative Francis Mara, Woodward's 1991 successor as Insurance Committee House Chair. Sawyer also hosted dinners for legislators and their families. In September 1992, Sawyer provided Representative Mara and his wife tickets for a show in Hancock's private box at the Wang Center and ordered an accompanying dinner.

The apparent catalyst for this prosecution was a December 1992 trip to Puerto Rico where Sawyer, other lobbyists, and a group of legislators, including Representative Mara, travelled for a legislative conference. The group did not stay at the conference site, but instead went to a different resort where Sawyer paid for many of the legislators' meals, transportation, and golf. Hancock reimbursed Sawyer for some $4,000 of entertainment expenses from the Puerto Rican trip.[1]

Both Sawyer and his supervisor, Hathaway, had reason to believe that these expenditures could or did violate certain state laws. In his office, Sawyer kept internal Hancock memoranda, newspaper articles, and opinions of the Massachusetts Ethics Commission, all explaining or reporting on Massachusetts ethics-in-lobbying. While some of the documents varied in their interpretations, they nonetheless advised on compliance with laws regarding gratuities, gifts, and lobbying expenditures.

In April 1993, a reporter from the Boston Globe newspaper queried Richard Bevilacqua, Hancock's Director of Employee and Customer Communications, about Sawyer's entertainment of legislators during the 1992 Puerto Rico trip and about Hancock's legislative agenda during that period. Bevilacqua, in turn, asked Sawyer about the trip, and

1. In 1986, Sawyer and his wife travelled with Representative Woodward and his wife to New Orleans for the Super Bowl. Hancock provided the game tickets and reimbursed Sawyer for the airfare. The district court instructed the jury that, because this trip occurred before the mail fraud statute proscribed honest services fraud, it could not provide the sole basis for a mail fraud conviction. The court added, however, that the jury could consider the trip as evidence of Sawyer's state of mind with respect to the alleged scheme to defraud.

Sawyer opined, "it's difficult to take anyone out to lunch or dinner these days without going over [the] amount [permitted by law]." This set of events prompted Hancock to begin an internal investigation into Sawyer's legislative expenditures.[2] Bruce A. Skrine, vice president, corporate counsel and secretary for Hancock, asked Sawyer for his expense records. Contemporaneous with Sawyer's production of the records, Sawyer told Skrine that the expenses were "consistent with the way ... things were done on Beacon Hill." Sawyer also told Skrine that his reason for making the expenditures was "to get to know" the legislators and to develop "a certain relationship so that you could turn to them"; he further indicated that he made these expenditures to "build and maintain relationships," gain "access to legislators," and get legislators to "return his calls as a result of [the expenditures]."

Sawyer caused the mailing of items related to the expenditures on legislators, including golf bills, reimbursement requests, and credit card bills. Sawyer also caused the making of interstate telephone calls to arrange for some of the entertainment.

Following a nine-day trial, the jury convicted Sawyer of fifteen counts of mail fraud, nine counts of wire fraud, eight counts of interstate travel to commit bribery, and one count of conspiracy. The jury acquitted Sawyer of two additional mail fraud counts.

## II.

### Mail and Wire Fraud Counts

The government charged that Sawyer and his unindicted co-conspirator—his Hancock supervisor, Hathaway—engaged in a scheme to deprive the Commonwealth of Massachusetts and its citizens of the right to the honest services of their state legislators,[3] and used the mails and interstate telephone wires in furtherance of the scheme, in violation of 18 U.S.C. §§ 1341, and 1343.[4]

■ Sawyer contends that his convictions impermissibly involve the federal government in setting standards of good government for local and state officials. He argues that this case is exemplary of the "dangers of standardless federal criminal enforcement and unbridled prosecutorial discretion long-recognized under the mail fraud statute." We have already considered and rejected these arguments, however. *See United States v. Silvano*, 812 F.2d 754, 758–59 (1st Cir.1987). Congress may protect the integrity of the interstate mails and wires by forbidding their use in furtherance of schemes to defraud a state and its citizens, whether or

**2.** In the Spring of 1993, the United States Attorney's Office for the District of Massachusetts ("USAO") commenced an investigation into Hancock's involvement in the allegedly illegal expenditures on legislators. In March 1994, Hancock entered into a civil settlement with the USAO whereby it paid a fine of about $1,000,000 and promised to cooperate with the USAO. In return, the USAO agreed not to prosecute Hancock for any matter relating to the investigation.

**3.** According to the indictment, the legislators' duty of honest services included the obligation to perform their jobs as Massachusetts lawmakers free from deceit, fraud, dishonesty, favoritism and self-enrichment. By consent of the parties, the district court struck the word "favoritism" in this description. *United States v. Sawyer*, 878 F.Supp. 279, 294 (D.Mass.1995). In addition to this general duty of honest services, the indictment stated that the legislators had a specific duty to abide by the Massachusetts laws set forth in the indictment. The indictment identified both the Commonwealth of Massachusetts and its citizenry as the fraud victims; for simplicity, we will refer only to the public (or "citizenry") as the victim.

With regard to the scheme to defraud, the indictment charged, *inter alia*, that Sawyer gave, and legislators accepted, travel, lodging, golf, meals and other entertainment in violation of Massachusetts law; that Sawyer monitored the public coverage of the Massachusetts Legislature so that he could ensure the nondisclosure of his gratuities; that Sawyer was given greater access to the Insurance Committee and its House Chair than was available generally to the citizenry; that the House Chair of the Insurance Committee repeatedly performed official acts advocated by Sawyer on behalf of Hancock; and that Sawyer's direct supervisor approved of, and authorized Hancock's reimbursement of Sawyer for, his illegal gratuities.

**4.** In relevant part, 18 U.S.C. §§ 1341 and 1343 provide:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... [uses the mails or wires, or causes their use] for the purpose of executing such scheme or artifice ... [shall be punished].

not it can forbid the scheme itself. *See id.* at 758 (citing *Badders v. United States,* 240 U.S. 391, 393, 36 S.Ct. 367, 367–68, 60 L.Ed. 706 (1916)); *United States v. Rendini,* 738 F.2d 530, 533 (1st Cir.1984).[5]

Sawyer also contends that the government has failed to establish that he committed "honest services" mail and wire fraud ("honest services fraud") within the meaning of the statutes. To explain our resolution of this issue, we provide a brief overview of the law of honest services fraud. The ultimate issue is whether or not the "scheme" presented at trial actually targeted the Massachusetts' citizens' right to "honest services" within the meaning of the mail fraud statute.

To prove mail and wire fraud, the government must prove, beyond a reasonable doubt: (1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud, and (2) the use of the mails or interstate wire communications in furtherance of the scheme.[6] *United States v. Montminy,* 936 F.2d 626, 627 (1st Cir.1991) (listing mail fraud elements); *United States v. Cassiere,* 4 F.3d 1006, 1011 (1st Cir.1993) (listing wire fraud elements). Because the relevant language in both the mail and wire fraud statutes is the same, we analyze both offenses together for the purposes of this case and, for simplicity, we refer only to mail fraud. *See United States v. Boots,* 80 F.3d 580, 586 n. 11 (1st Cir.1996).

Traditionally, the mail fraud statute reached schemes that deprived the fraud victim of property or some other item of economic value. *See generally, United States v. Grandmaison,* 77 F.3d 555, 565–66 (1st Cir.

1996). Some courts later expanded the scope of the statutes to encompass schemes intended to defraud citizens of their intangible, non-property right to the honest services of their public officials. *See generally,* W. Robert Gray, Comment, *The Intangible–Rights Doctrine and Political–Corruption Prosecutions Under the Federal Mail Fraud Statute,* 47 U. Chi. L.Rev. 562, 563 (1980) and cases cited therein. Those courts rationalized that a public official "acts as 'trustee for the citizens and the State ... and thus owes the normal fiduciary duties of a trustee, *e.g.,* honesty and loyalty' to them." *Silvano,* 812 F.2d at 759 (quoting *United States v. Mandel,* 591 F.2d 1347, 1363 (4th Cir.), *aff'd in relevant part en banc,* 602 F.2d 653, 653 (4th Cir.1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980)).

In 1987, the United States Supreme Court held, contrary to every circuit court that had decided the issue, that the mail fraud statute did not prohibit schemes to defraud citizens of their intangible, non-property right to honest and impartial government. *McNally v. United States,* 483 U.S. 350, 359, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987); *see United States v. Ochs,* 842 F.2d 515, 521 (1st Cir.1988) (noting Court's unexpected decision), *cert. denied,* 498 U.S. 895, 111 S.Ct. 245, 112 L.Ed.2d 204 (1990). Congress quickly reacted to the *McNally* decision by enacting 18 U.S.C. § 1346, which provides that, for the purposes of, *inter alia,* the mail and wire fraud statutes, "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." We have recognized that § 1346 was intended to overturn *McNal-*

---

**5.** Some have observed that these statutes are increasingly used effectively to convict and punish for the substantive fraud, and that the use of the mails or wires is merely a "jurisdictional hook" to bring the conduct within the proscription of the mail and wire fraud statutes. *See* Peter J. Henning, *Maybe It Should Just Be Called Federal Fraud: The Changing Nature of the Mail Fraud Statute,* 36 B.C. L.Rev. 435 (1995); *cf. Schmuck v. United States,* 489 U.S. 705, 722–23, 109 S.Ct. 1443, 1453–54, 103 L.Ed.2d 734 (1989) (Scalia, J. dissenting) (disagreeing with majority's conclusion that certain mailings were in furtherance of the demonstrated scheme, and observing that "[t]he law does not establish a general federal remedy against fraudulent con-

duct, with the use of the mails as the jurisdictional hook.... In other words, it is mail fraud, not mail and fraud, that incurs liability." (internal citations, quotations and alterations omitted)).

**6.** The use of the mails or wires to further the fraudulent scheme need only be "incidental." *United States v. Grandmaison,* 77 F.3d 555, 566 (1st Cir.1996). Moreover, the "[d]efendant[ ] need not personally use the [mails or] wires as long as such use was a reasonably foreseeable part of the scheme in which [he] participated." *United States v. Boots,* 80 F.3d 580, 585 n. 8 (1st Cir.1996).

*ly* and reinstate the reasoning of pre-*McNally* case law holding that the mail fraud statute reached schemes to defraud individuals of the intangible right to honest services of government officials. *See Grandmaison,* 77 F.3d at 565–66.[7]

The concept of governmental "honest services" in this context eludes easy definition. As Judge Winter has aptly noted:

> One searches in vain for even the vaguest contours of the legal obligations created beyond the obligation to conduct governmental affairs "honestly" or "impartially," to ensure one's "honest and faithful participation" in government and to obey "accepted standards of moral uprightness, fundamental honesty, fair play and right dealing" .... (citation omitted) [T]he quest for legal standards is not furthered by reference to "the right to good government" and the duty "to act in a disinterested manner."

*United States v. Margiotta,* 688 F.2d 108, 142–143 (2d Cir.1982) (Winter, J., concurring in part and dissenting in part) (quoting *Mandel,* 591 F.2d at 1361), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

The cases in which a deprivation of an official's honest services is found typically involve either bribery of the official or her failure to disclose a conflict of interest, resulting in personal gain. In a leading case involving the bribery of a state governor on legislative matters, the Fourth Circuit explained how bribery of an official can constitute honest services fraud:

> [T]he fraud involved in the bribery of a public official lies in the fact that the public official is not exercising his independent judgment in passing on official matters.... When a public official has been bribed, he breaches his duty of honest,

faithful and disinterested service.... [T]he official has been paid for his decisions, perhaps without even considering the merits of the matter. Thus, the public is not receiving what it expects and is entitled to, the public official's honest and faithful service.

*Mandel,* 591 F.2d at 1362; *see also, Boots,* 80 F.3d at 592–94 (involving scheme to bribe Native–American police chief in exercise of his border patrol duties); *United States v. Holzer,* 816 F.2d 304, 308 (7th Cir.) (judge's systematic receipt of bribes and "loans" to influence official actions), *vacated,* 484 U.S. 807, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987) (ordering reconsideration in light of *McNally*); *United States v. Isaacs,* 493 F.2d 1124, 1149–51 (7th Cir.) (public officials received bribes intended to induce special favors and preferential treatment for certain racing interests), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974).

■■■ A public official has an affirmative duty to disclose material information to the public employer. *See Silvano* 812 F.2d at 759. When an official fails to disclose a personal interest in a matter over which she has decision-making power, the public is deprived of its right either to disinterested decision making itself or, as the case may be, to full disclosure as to the official's potential motivation behind an official act. *See id.* (upholding conviction of city fiduciary who failed to disclose material information about unnecessary spending of city money for secret enrichment of fiduciary's friend). Thus, undisclosed, biased decision making for personal gain, whether or not tangible loss to the public is shown, constitutes a deprivation of honest services. *See e.g., Grandmaison,* 77 F.3d at 567 (city board member took secret action to influence award of public contract to official's private construction-

---

7. *See also* 134 Cong. Rec. H11108–01, 1988 WL 182261 (Oct. 21, 1988) (statement of Rep. Conyers) ("This amendment is intended merely to overturn the *McNally* decision. No other change in the law is intended."); 134 Cong. Rec. S17360–02, 1988 WL 182529 (Nov. 10, 1988), Section Analysis of Judiciary Committee Issues in H.R. 5210, (Statement of Sen. Biden) ("[Section 1346] overturns the decision in *McNally* .... The intent is to reinstate all of the pre-*McNally* case law pertaining to the mail and wire

fraud statutes without change"). *But see United States v. Brumley,* 79 F.3d 1430, 1440 (5th Cir. 1996) (holding that § 1346 does not clearly reach schemes to defraud citizens of their right to government officials' honest services).

Given the peculiar history and evolution of honest-services mail fraud, we review case law from before and after the *McNally* decision for guidance in discerning the parameters of this federal crime.

business interest); *United States v. Waymer,* 55 F.3d 564 (11th Cir.1995) (board of education member received secret commissions from companies contracting with school system), *cert. denied,* —— U.S. ——, 116 S.Ct. 1350, 134 L.Ed.2d 519 (1996).

■ The broad scope of the mail fraud statute, however, does not encompass every instance of official misconduct that results in the official's personal gain. For example, in *United States v. McNeive,* 536 F.2d 1245, 1246 (8th Cir.1976), a city plumbing inspector repeatedly accepted unsolicited gratuities in connection with his non-discretionary, administrative duty to issue plumbing permits. Although McNeive may have violated a city ordinance banning the acceptance of gratuities by city officials, the court found his conduct beyond the reach of the mail fraud statute because there was no evidence that the gratuities disadvantaged the city in any respect or that they deterred McNeive from otherwise conscientiously performing his duties. *Id.* at 1251. In short, the "scheme" was shown to neither involve nor contemplate the deprivation of McNeive's honest services to the city or public.

Likewise, in *United States v. Rabbitt,* 583 F.2d 1014, 1026 (8th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979), the Eighth Circuit reversed the mail fraud convictions of Rabbitt, a state representative. Rabbitt had offered to introduce a friend's architectural firm to certain public officials responsible for awarding state architectural contracts, in return for a ten percent commission on any work awarded. *Id.* at 1020. The government charged that his receipt of the resulting, undisclosed commissions defrauded the citizens of Rabbitt's honest services. *Id.* at 1025. The evidence showed, however, that the officials who awarded the architectural contracts did so on merit alone and Rabbitt played no role in the selection of the firm. *Id.* at 1026. Because Rabbitt did not control the awarding of the contracts, or otherwise fail to fulfill his official duties, his conduct did not deprive the citizens of his honest services. *Id.* (noting case's resemblance to *McNeive,* 536 F.2d at 1251–52). The court also observed that the government failed to cite any applicable standard requiring Rabbit to disclose his interest in the contracts, and thus, the citizens were not deprived of any right to such disclosure. *Id.* at 1026.

■ The *McNeive* and *Rabbitt* cases illustrate that although a public official might engage in reprehensible misconduct related to an official position, the conviction of that official for honest-services fraud cannot stand where the conduct does not actually deprive the public of its right to her honest services, and it is not shown to intend that result. Similarly, if a non-public-official is prosecuted for scheming to defraud the public of an official's honest services, the government must prove that the target of the scheme is the deprivation of the official's honest services. If the "scheme" does not, as its necessary outcome, deprive the public of honest services, then independent evidence of the intent to deprive another of those services must be presented. *See United States v. D'Amato,* 39 F.3d, 1249, 1257 (2d Cir.1994) ("Where the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent."); *United States v. Von Barta,* 635 F.2d 999, 1005–1006 n. 14 (2d Cir.1980) (noting that "the prosecution must prove that some actual harm or injury was at least contemplated"), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981). With this background, we consider the facts of this case.

## A. Scheme to Defraud

Here, the government did not prosecute Sawyer on the theory that he, as a lobbyist, directly owed a duty of honest services to the Commonwealth or its citizens. Rather, the government sought to prove that Sawyer engaged in conduct intended to cause state legislators to violate their duty to the public. The government sought to establish this scheme by proving that Sawyer intentionally violated, or caused members of the legislature to violate, two Massachusetts statutes.

Briefly, these two Massachusetts statutes, discussed more fully *infra,* are: (1) Mass. Gen. L. ch. 268B, § 6 (the "gift" statute), which prohibits—under threat of civil penal-

ties—a "legislative agent" from offering or giving to a public official (or an official's acceptance of) "gifts" aggregating $100 or more per year; and (2) Mass. Gen. L. ch. 268A, § 3 (the "gratuity" statute), which prohibits—under threat of civil and criminal penalties—anyone from giving to a legislator (or a legislator from soliciting or accepting) anything of "substantial value ... for or because of any official act performed or to be performed" by that person. Through the violation of these laws, the government contended, Sawyer stole the honest services of the legislators.

In general, proof of a state law violation is not required for conviction of honest services fraud. See Silvano, 812 F.2d at 759. Indeed, the incorporation of a state law violation in such a prosecution may cause complications. See United States v. Washington, 688 F.2d 953, 958 (5th Cir.1982) (reversing mail fraud conviction where jury should have been instructed that the defendant "should not be found guilty of the federal offense merely because he violated state law"). Here, however, the parties agree that the indictment, as structured, required it to prove that Sawyer violated at least one state law. Thus, the state laws in question had to be correctly charged as a matter of state law, and the violation of at least one had to be proven.

Sawyer appeals various aspects of the court's jury instructions on the state statutes and their role in the alleged scheme to defraud. To determine whether the court's instructions adequately explained the law or whether they "tended to confuse or mislead the jury," United States v. Alzanki, 54 F.3d 994, 1001 (1st Cir.1995) (internal quotations and citation omitted), cert. denied, —— U.S. ——, 116 S.Ct. 909, 133 L.Ed.2d 841 (1996), we review the entire charge pertaining to the role of the state statutes in this honest services fraud prosecution:

> In this case the government has charged Mr. Sawyer with devising a scheme or artifice; that is, a plan, to deprive the Commonwealth of Massachusetts and its citizens of their right to the honest services of members of the Massachusetts Legislature by giving or offering to those legislators gifts of free travel, lodging, golf, meals, and other entertainment. I instruct you that under the mail and wire fraud statutes, a scheme to defraud can be a plan to deprive the public of its right to the honest services of members of the Massachusetts Legislature.
>
> Elected public officials, such as members of the Massachusetts Legislature, owe certain duties to the Commonwealth of Massachusetts and to its citizens. One of those duties is the duty to act honestly. *The government charges that by violating and causing legislators to violate certain state statutes, Mr. Sawyer deprived the public of its right to the honest services of members of the Massachusetts Legislature and, therefore devised a scheme to defraud.*
>
> In other words, the government alleges that the *defendant violated federal laws, mail fraud and wire fraud, by intentionally violating or causing Massachusetts legislators to violate certain state laws.* Accordingly, in order to prove the first element of the mail fraud and/or wire fraud, that the defendant devised a scheme to defraud, the government must prove beyond a reasonable doubt that the defendant intentionally violated or caused members of the Massachusetts Legislature to violate at least one of the following two state laws .... (emphasis added).

After describing the two statutes, the court continued:

> If you find beyond a reasonable doubt that the defendant devised or created a scheme to defraud in which he intentionally violated or caused a violation of at least one of the laws that I have just described, then you may find that the government has proved the first element of mail fraud and wire fraud.

These instructions permitted the jury to find the requisite scheme to defraud upon proof that Sawyer violated, or caused legislators to violate, *either* one of the state statutes. In other words, the jury was allowed to find that a violation of either statute, without more, constituted the deprivation of

honest services.[8] At oral argument before this court, the government affirmed that it chose the state law violations as "the sole vehicle to prove the scheme or artifice to defraud" in order to "narrow the issues of intent and good faith." Thus, we analyze both state statutes in light of the law of honest services, set forth above, to determine whether the court's instructions erroneously permitted a conviction for conduct not within the reach of the mail fraud statute.

### 1. The Gift Statute

The first Massachusetts statute on which the alleged scheme to defraud was based is ch. 268B, § 6 (the "gift statute"), which provides:

> No legislative agent shall knowingly and wilfully offer or give to a public official or public employee or a member of such person's immediate family, and no public official or public employee or member of such person's immediate family shall knowingly and wilfully solicit or accept from any legislative agent, gifts with an aggregate value of one hundred dollars or more in a calendar year.

Mass. Gen. L. ch. 268B, § 6. We discuss Sawyer's challenges to the court's instructions on the statutory definitions before turning to the statute's relation to the scheme to defraud.

#### a. "Legislative Agent"

The court instructed the jury that, under the statute, a legislative agent cannot give or offer gifts aggregating $100 or more to a legislator or member of the legislator's family. It further instructed that a "legislative agent" is "any person who, for compen-

sation or reward, does any act to promote, oppose or influence legislation." *See* Mass. Gen. L. ch. 268B, § 1(g).[9] Sawyer argues that this instruction failed to reflect his assertion that a person is a "legislative agent" only when he is so registered with the Secretary of State or he is actually engaging in lobbying activity at the time he gave the alleged gifts.

The court instructed that a legislative agent is one who is paid to "promote, oppose or influence legislation," *i.e.*, to lobby, and that such agents are forbidden to give or offer certain "gifts." The instruction, as a whole, adequately conveyed the idea that such gifts are forbidden only when given by those who, at the time of the gifts, are paid to actually lobby. While there may be a person with the job title "lobbyist" who does not actually engage in lobbying, there was ample evidence here that Sawyer lobbied at the time he gave the alleged "gifts." Moreover, the fact that he had an obligation to register with the Secretary of State, *see* Mass. Gen. L. ch. 3, §§ 40, 41, does not alter the definition. No further instruction was required.

#### b. Shared Meals as "Gifts"

The court instructed the jury that "gifts," under the relevant Massachusetts law, are "a payment, entertainment, subscription, advance, services or anything of value, unless consideration of equal or greater value is received." *See* Mass. Gen. L. ch. 268B, § 1(g). Much of the evidence offered to prove Sawyer's violations of the gift statute was his payment for shared meals and entertainment with the legislators. Sawyer

---

8. After the court instructed the jury, Sawyer lodged the following objection:

Your Honor, I believe that the Court's instruction failed to properly instruct the jury that, even if it finds that the defendant violated one of the two state statutes ... the defendant would not be guilty of any federal offense, mail fraud and wire fraud offense, unless [the violation] was part of a plan to defraud the Commonwealth of Massachusetts or its citizens of the duty of honest services.

The court declined any further charge.

9. The entire definition of "legislative agent," for purposes of the gift statute, is:

any person who for compensation or reward does any act to promote, oppose or influence legislation.... The term shall include persons who, as any part of their regular and usual employment and not simply incidental thereto, attempt to promote, oppose or influence legislation ... whether or not any compensation in addition to the salary for such employment is received for such services.

Mass. Gen. L. ch. 268B, § 1(g); *see also* 3 § 39 (identical definition in statutory section on disclosure obligations).

contends that his payment for "shared hospitality" does not constitute a "gift" within the meaning of the statute. The issue turns out to be potentially complicated and involves somewhat convoluted analysis of the statutory history of a comparable law set forth at Mass. Gen. L. ch. 3, § 43. We have carefully reviewed the arguments on both sides, and for the reasons set forth in the district court's ruling, *see Sawyer,* 878 F.Supp. at 282–84, we conclude that Sawyer's shared meals could, if the jury so found, fit within the gift definition's term "entertainment" and/or the very broad phrase, "anything of value."

### c. Relation to Scheme to Defraud

██ As explained above, under the court's jury instructions regarding the scheme to defraud, Sawyer's intentional violations of the gift statute, by their very occurrence (or *ipso facto* ), must deprive the public of their legislators' honest services. Sawyer challenges this legal premise, arguing that such violations do not necessarily deprive the public of those services.[10] For the reasons that follow, we agree.

The gift statute, which forbids a legislative agent from "knowingly and wilfully" giving a "public official ... gifts with an aggregated value of one hundred dollars or more in a calendar year," Mass. Gen. L. ch. 268B, § 6, simply limits, by a dollar-amount, the gift-giving by lobbyists to legislators. It is a prophylactic civil prohibition that addresses appearances of—but not actual—corruption. A violation of the Massachusetts gift statute does not necessarily entail any improper motive to influence, or otherwise affect, the official *duties* of the recipient. It is possible for a lobbyist to give a legislator items falling

within the statute's definition of "gift," or for a legislator to accept such gifts, without an accompanying intent to cause the legislator to deviate from the honest performance of official duties. While such gifts would constitute a gift-statute violation, not every such circumstance would necessarily amount to a deviation from the official's performance of honest services to the public.[11] Thus, unlike the honest services fraud cases, noted above, in which an official was bribed or took official action based on a secret conflict of interest, a gift statute violation, even if intentional, does not in itself amount to honest services fraud.

██ While the Massachusetts' citizenry expects their legislators to comply with laws pertaining to their official capacity, the presence of such illegal conduct, even though it relates to public office, does not by itself (or, *per se* ) establish honest services fraud. *Cf. See United States v. Dowling,* 739 F.2d 1445, 1449–50 (9th Cir.1984) (rejecting government's suggestion that "the presence of illegal conduct alone may constitute the basis of the 'fraud' element of a mail fraud prosecution" and stating that "to hold otherwise ... would have the potential of bringing almost any illegal act within the province of the mail fraud statute"), *rev'd on other grounds,* 473 U.S. 207, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985); *United States v. Gallant,* 570 F.Supp. 303, 309 and n. 7 (S.D.N.Y.1983) (noting that Congress forbade the use of the mails in furtherance of "any scheme or artifice to defraud" and not in furtherance of "any crime"). To allow every transgression of state governmental obligations to amount to mail fraud would effectively turn every such violation into a federal felony; this cannot be countenanced.

10. The government claims that Sawyer has only challenged the evidentiary sufficiency of his fraudulent intent, and thus has waived a jury instruction challenge on the issue. We disagree. While Sawyer ultimately endeavors to persuade us that the evidence was insufficient to support his conviction, he squarely challenges the very legal theory upon which he was convicted. He particularly challenges the government's theory (as accepted by the district court) that, as a matter of law, the scheme to defraud could be predicated upon state law violations alone, without the intent to deprive the public of honest services. Sawyer not only lodged an adequate objection on this issue with the trial court, *see supra* note 8, his brief to this court thoroughly addresses the precise legal issues surrounding the interplay between the mail statute, the state statutes, and the requirement of fraudulent intent. The legal arguments are sharply presented and the record is adequate for our review. Thus, we conclude that the issue is properly before us.

11. We note that under Massachusetts law, violation of the gift statute is punishable by no more than a $2000 *civil* fine.

Because the court's instructions allowed the jury to equate a gift statute violation with the deprivation of honest services, it also permitted the jury to find an "intent to defraud" from the intent to violate the statute, without more. To establish the scheme to defraud through these violations, however, it must also have been charged and shown that the *intent* behind the violations was the deprivation of honest services. *See D'Amato*, 39 F.3d at 1257 (explaining that where harm is not the necessary result of the scheme, independent evidence of fraudulent intent is required). Thus, this case required a separate instruction that, to prove the intent to commit honest services fraud, the jury had to find that Sawyer *intended to influence or otherwise improperly affect the official's performance of duties*, not merely that he intended to violate the state statute.[12] Allowing the jury to find that Sawyer intended to defraud the public of its right to honest services based on proof of gift statute violations alone constituted reversible error. *See United States v. Doherty*, 867 F.2d 47, 57 (1st Cir.), *cert. denied*, 492 U.S. 918, 109 S.Ct. 3243, 106 L.Ed.2d 590 (1989) (observing that reversal of convictions is required if instructions "could have led the jury to convict for conduct outside the proscription of the mail fraud statute").

### 2. The Gratuity Statute

The second Massachusetts statute upon which the convictions for honest-services mail fraud rely, is ch. 268A, § 3 (the "gratuity statute"), which provides, in part:

(a) Whoever, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly gives, offers or promises anything of substantial value to any present or former state ... employee ... for or because of any official act performed or to be performed by such an employee

. . . .

(d) ... shall be punished by a fine of not more than three thousand dollars or by imprisonment for not more than two years, or both.

Mass. Gen. L. ch. 268A, § 3.

The centerpiece of the gratuity statute is the giving of an item of "substantial value" (the "gratuity"), to an official, "for or because of any official act performed or to be performed" by the official. Because this language entails some connection between the gift and the performance of official duties, a gratuity statute violation—unlike a gift statute violation—may itself be sufficient to implicate the duty of honest services in a given case. As with the gift statute, however, not every violation of the gratuity statute automatically encompasses an intent to induce the public official to alter or deviate from the performance of honest and impartial services. We explain.

A Massachusetts gratuity offense does not require a finding of corrupt intent, *i.e.*, improper intent to influence official decision making. *See Commonwealth v. Dutney*, 4 Mass.App.Ct. 363, 348 N.E.2d 812, 821 (1976) (finding gratuity offense to be a lesser included offense of Massachusetts bribery statute, Mass. Gen. L. ch. 268A, § 2, which adds the element of "corrupt intent" *i.e.*, intent to influence);[13] *cf. United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir.1993) (observing that gratuity offense, unlike bribery, does not involve a "corrupt purpose").

---

**12.** This intent is not equivalent to, or subsumed within, the intent to *deceive* the public, discussed *infra*. In addition to *deceit* (the gravamen of "fraud"), the government must also show the intent to *harm* (in this case, to deprive of honest services). *See McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791–92 (1st Cir.) (explaining that mail fraud requires both deceit and deprivation), *cert. denied*, 498 U.S. 992, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990); *D'Amato*, 39 F.3d at 1257 (explaining that "the deceit must be coupled with a contemplated harm to the victim") (quotation and citation omitted).

**13.** The Massachusetts bribery statute, which did not form a part of this case, provides, in part:

Whoever, directly or indirectly, *corruptly* gives, offers or promises anything of value to any state ... employee ..., *with intent ... to influence any official act* or any act within the official responsibility of such employee [shall be punished].

Mass. Gen. L. ch. 268A, § 2(a) (emphasis added).

Rather, only some lesser intent need be shown. A jury might be charged to find a bribery or gratuity offense in the alternative, thus allowing it to convict for a gratuity offense if it is convinced that the defendant gave something to a public official because of an official act, but is not persuaded that the defendant had a corrupt intent to influence that act. *See, e.g., Dutney,* 348 N.E.2d at 821.

As the word "gratuity" implies, the intent most often associated with the offense is the intent to "reward" an official for an act taken in the past or to be taken in the future. *See Mariano,* 983 F.2d at 1159 (noting that, unlike one who bribes, the gratuity offender "gives the gift without attaching any strings, intending it instead as a reward for actions the public official has already taken or is already committed to take"). The official act might otherwise be properly motivated; and the gratuity, though unlawful, might not be intended to influence the official's mindset with regard to that particular action. In some cases, such as a reward for long-past official action, the intent to influence could not possibly exist. A finding of honest services fraud, however, requires, in connection with the gratuity, the intent to cause an official to deviate from the honest performance of services.

Thus, as with the gift statute, proof of a violation of the Massachusetts gratuity statute, without more, does not establish an intent to commit honest services fraud. The government must prove that the conduct was accompanied by the requisite intent. This intent could be shown in a number of ways. For example, a bribery-like, corrupt intent to influence official action necessarily is an intent to deprive the public of an official's honest services. A person might not, however, give an unlawful gratuity with the intent to effect a specific *quid pro quo.* Rather, as the government contends here, a person with continuing and long-term interests before an

official might engage in a pattern of repeated, intentional gratuity offenses in order to coax ongoing favorable official action in derogation of the public's right to impartial official services. Such conduct would be akin to (although not a classic case of) the conflict of interest cases noted above. *See, e.g., Grandmaison,* 77 F.3d at 567; *Silvano,* 812 F.2d at 759. Here, for example, while Sawyer may not have provided the legislators with direct kickbacks or commissions arising out of the specific official action, he may have intended the legislators generally to treat preferentially Hancock's interests, knowing that the free meals, entertainment, and golf would continue so long as favorable official acts were, at some point, taken.

In this case, the district court did not, in fact, instruct the jury on a true "gratuity" offense. Instead, it instructed the jury that, to establish a gratuity offense, the government must prove that Sawyer "gave something of substantial value to a legislator *with the intent to influence an official act* of that legislator." While this instruction erroneously added an intent-to-influence element to the gratuity offense, it also had the effect of charging the jury to find the requisite intent for honest services fraud.[14]

### 3. Conclusion: Scheme to Deprive of Honest Services

The jury was permitted to find the first element of mail and wire fraud, the scheme to defraud, upon proof that either the gift statute or the gratuity statute was violated. The *gift* statute as charged, however, was a legally insufficient basis upon which to find the scheme to defraud. Although the *gratuity* statute was properly instructed in terms of honest services mail fraud, we cannot tell if the convictions were based on that statute or the insufficiently charged gift statute. When a jury has been presented with several bases for conviction, one of which is legally erroneous, and it is impossible to tell

---

**14.** The court also instructed the jury that it is not a defense to a gratuity charge that the official act would have occurred even if the gratuity had not been given. *See United States v. Previte,* 648 F.2d 73, 82 (1st Cir.1981). Sawyer assigns error to this instruction, contending that the fact that the act would have occurred without the gratuity is indicative of good faith. Sawyer fails to explain, however, how the fact that an official act would have occurred anyway could have affected *his* state of mind when giving the gratuities. The court's instruction was a correct statement of the law, relevant to this case, and it was not in error.

which ground the jury convicted upon, the conviction cannot stand. *United States v. Nieves–Burgos,* 62 F.3d 431, 435–36 (1st Cir. 1995).

The government contends that if we find error with respect to the gift statute, we should affirm the convictions because the jury found that Sawyer committed gratuity offenses within the Travel Act convictions, discussed *infra.* We cannot assume from the Travel Act convictions, however, that the jury based its mail and wire fraud convictions on the gratuity statute. The court charged the jury to consider each offense as separate bases for the mail and wire fraud charges. Accordingly, the possibility exists that, when convicting on the mail and wire fraud charges, the jury focused on violations of the gift statute, alone. *See Boots,* 80 F.3d at 589 (declining to affirm conviction where it was possible that the jury focused its verdict on erroneous basis). Thus, for the foregoing reasons, Sawyer's mail and wire fraud convictions must be reversed.

■ Sawyer contends that the evidence was insufficient to prove an intent to influence the legislators' official acts and that therefore his conviction should be reversed without the possibility of retrial. We cannot agree. At trial, there was evidence that Sawyer intentionally and repeatedly provided legislators with valuable gifts of entertainment for the purpose of obtaining "greater access" to,[15] and of developing a "certain relationship with," legislators. A jury could credit Sawyer's defense that he thought his expenditures were lawful and that they were meant only for goodwill entertaining. Taking the evidence in the light most favorable to the prosecution, however, *see United States v. Olbres,* 61 F.3d 967, 970 (1st Cir.), *cert. denied,* ── U.S. ──, 116 S.Ct. 522, 133 L.Ed.2d 430 (1995), a jury could also ration-

ally infer, beyond a reasonable doubt that Sawyer intended that his repeated gifts and gratuities would induce legislators to perform official acts to benefit Hancock's interests regardless of, or at the expense of, the public interest. Hence, retrial is not precluded. *See Boots,* 80 F.3d at 589–90 (reversing because of legal error in instructions but remanding for possible retrial because the evidence was sufficient for proper conviction); *United States v. Ochs,* 842 F.2d 515, 529 (1st Cir.1988) (same).

In view of the possibility that the government may choose to retry this case, we think it is useful to add a cautionary word concerning the relationship between state and federal law in cases such as this one. Our comments are addressed primarily to the mail fraud statute but apply in some measure to the Travel Act charge, discussed *infra,* as well. Two problems are of specific concern to us.

■ First, concerning the theft of honest services jury instruction, an overemphasis on what state law forbids may lead the jury to believe that state rather than federal law defines the crime, or more specifically, that any violation of a state law or regulation concerning lobbying or related matters amounts to honest services fraud. Wire and mail fraud are *federal* offenses; and while state violations may play a role, the jury should not be allowed to slip into the misunderstanding that any violation of proliferating state laws and regulations controlling this area automatically amounts to a federal crime.

■ In a similar vein, we think there exists a risk in this case—particularly in view of the prosecutor's closing argument with its repeated emphasis on permissible dollar limits in lobbying—that the jury could wrongly

---

**15.** We do not think that the desire to gain access, by itself, amounts to an intent to influence improperly the legislators' exercise of official duties. The government points to no legislative duty to provide equal access to all members of the public; and, from a practical standpoint, we doubt one exists. *See Sawyer,* 878 F.Supp. at 294 (striking phrase "free from favoritism" from indictment's list of legislators' duties). True, Sawyer's very job description required him to develop contacts in the Legislature, and, as with

all lobbyists, his employment goal was to persuade and influence legislators to benefit certain interests. Such endeavors, however, are protected by the right "to petition the Government for a redress of grievance" guaranteed by the First Amendment of the United States Constitution, *see United States v. Harriss,* 347 U.S. 612, 625, 74 S.Ct. 808, 815–16, 98 L.Ed. 989 (1954); it would be impermissible to rely upon the lobbying position simpliciter to establish a corrupt intent to influence.

believe that any expenditure in excess of that allowed by state statute or regulation by itself constitutes the federal offense. The district court has ample authority under Federal Rule of Evidence 403 to limit evidence concerning state law requirements where that evidence is substantially more prejudicial than probative. And, in all events, jury instructions need to make clear that for the federal honest services fraud to be proven, the defendant must have the intent to affect a legislator's performance of an official act and not merely to make payments in excess of some state specified limitations.

## B. Intent to Deceive

Whether or not a new trial on the mail and wire fraud counts is allowable requires us to reach Sawyer's additional contention that the evidence was insufficient to establish his intent to deceive the public. To this end, Sawyer contends that because the government did not establish that he had a duty to disclose his illegal gifts and gratuities to the public, his intent to deceive the public had to be shown through affirmative acts of deception, which he claims are absent here.

 To establish mail fraud—in cases involving honest services fraud and otherwise—the alleged scheme must involve deception in the deprivation of money, property, or the right to honest services. *See McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir.) ("[N]ot every use of the mails or wires in furtherance of an unlawful scheme to deprive another of property constitutes mail or wire fraud.... Rather, the scheme must be intended to *deceive* another, by means of false or fraudulent pretenses, representations,

promises or other deceptive conduct.") (citations omitted), *cert. denied*, 498 U.S. 992, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990); *see also Grandmaison*, 77 F.3d at 567 (finding that public official's conduct of secretly delivering gratuities to other officials for favorable action, "without disclosing his actions to other [officials]," falls within purview of honest services mail fraud) (citing *McEvoy Travel*, 904 F.2d at 791); *United States v. Bush*, 522 F.2d 641, 648 (7th Cir.1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976).[16] While a misrepresentation of fact is not required to establish mail fraud, *McEvoy Travel*, 904 F.2d at 791, a demonstrated intent to deceive is required.

 When the conduct of a government official is involved, "the affirmative duty to disclose material information arises out of [the] official's fiduciary relationship to [the public]." *Silvano*, 812 F.2d at 758; *see id.* at 760 ("Although not all dishonest or disloyal conduct by an employee violates the mail fraud statute, an employee's breach of a fiduciary duty falls within the strictures of the statute when it encompasses the breach of a duty to disclose material information to the employer."). Thus, an official's intentional violation of the duty to disclose provides the requisite "deceit." *See id.* at 760 (noting that failure to disclose "under circumstances where the non-disclosure could or does result in harm to the employer is a violation of the mail fraud statute") (citation and internal quotations omitted).

 Here, although the issue has not been clearly presented by the parties, it appears that the requisite intent to deceive could have been shown either through Saw-

---

**16.** Under 18 U.S.C. § 1346, "the term 'scheme or artifice to defraud' includes a scheme or artifice to *deprive* another of the intangible right of honest services." (emphasis added). We do not think the word "deprive" in this section eliminates the requirement of *deceit* in an honest services fraud prosecution. Nor do we find that a deprivation of "honest" services, by definition, necessarily includes the deceit factor sufficient for mail fraud. By enacting § 1346, Congress meant to overturn *McNally*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which held that the scheme to defraud must be intended to deprive another of money or property. *Grandmaison*, 77 F.3d at 566. And prior to *McNally*,

courts endorsing the honest-services mail fraud theory invariably required some showing of deceit which is inherent in the term "fraud." *See Silvano*, 812 F.2d at 759–60; *Mandel*, 591 F.2d at 1361; *United States v. Barber*, 668 F.2d 778, 784–85 (4th Cir.), *cert. denied*, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982). We find nothing that indicates a change in this requirement for establishing honest services mail or wire fraud. Thus, while it may be difficult to conceive of a scheme to deprive someone of the right to honest services without intending to deceive that person, the intent to deceive must nonetheless be established.

yer's own acts of deception toward the public with respect to the gift/gratuity statute violations, or through his efforts to ensure that the legislators deceived the public with respect to the violations. The latter requires evidence only that Sawyer intended to cause the legislators intentionally to fail to disclose material information about the violations,[17] although evidence that he intended the legislators to affirmatively misrepresent themselves in this regard would also suffice. At bottom, the evidence must be sufficient to establish Sawyer's intent that, in the end, the public be deceived with respect to his unlawful gifts and gratuities.

■■■ Therefore, we must determine if the admissible evidence, viewed in light most favorable to the jury's verdict, is sufficient for a rational jury to find that Sawyer intended that the public be deceived. *See United States v. Kaplan,* 832 F.2d 676, 679 (1st Cir.1987), *cert. denied,* 485 U.S. 907, 108 S.Ct. 1080, 99 L.Ed.2d 239 (1988). The evidence need not compel an intent-to-deceive finding; rather, it is only required that a reasonable jury could be persuaded, beyond a reasonable doubt, that Sawyer had such intent. *See United States v. O'Brien,* 14 F.3d 703, 706–707 (1st Cir.1994). And we are mindful that a jury may choose among the reasonable alternatives posed by the evidence. *United States v. Olbres,* 61 F.3d 967, 973 (1st Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 522, 133 L.Ed.2d 430 (1995). Finally, the specific intent to deceive may be proven (and usually is) by indirect and circumstantial evidence. *See O'Brien,* 14 F.3d at 706 (observing that fraud crimes "by their very nature, often yield little in the way of direct proof"); *Kaplan,* 832 F.2d at 679; *see also United States v. Nivica,* 887 F.2d 1110, 1113 (1st Cir.1989) (opining that "factual circumstances may signal fraudulent intent in ways as diverse as the manifestations of fraud itself"), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990).

At first blush, it may appear that bribery of a public official necessarily incorporates a finding that the offender intended to "trick" or "deceive" the public into thinking that the official was acting independently when, in fact, the official was actually motivated by the bribe. While we have little doubt that bribes are usually given in secrecy, *see Holzer,* 816 F.2d at 309 (observing that "no public official in the United States takes bribes openly"), bribery and gratuity statutes generally, as here, do not *require* a separate element of deception. Ostensibly, a person could offer an illegal bribe to a public official and not be concerned with its secrecy. Thus, the evidence presented must permit a finding that Sawyer not only gave the unlawful gifts or gratuities with the intent to deprive the public of honest services, but that he also intended to deceive the public about that conduct. *See Bush,* 522 F.2d at 648.

Here, the government presented evidence that Sawyer gave the unlawful gifts and gratuities during the seven years of the indictment period until the Boston Globe exposed the practice in May 1993. Much of his entertainment of lobbyists took place out-of-state—usually at industry and legislative conferences—where members of the Massachusetts citizenry generally would not observe the questionable activities. Unlike his acts of "non-public" entertainment, Sawyer ensured compliance with state ethical standards for a 1993 Boston Marathon brunch, potentially a high profile event. In his office, Sawyer kept newspaper articles reporting legislators' activities with lobbyists, and in particular, the ethical ramifications of such relationships. In one article, Representative Mara (a recipient of Sawyer's unlawful gifts or gratuities) is quoted as saying, "Everyone picks up their own tabs at [legislative] conferences.... These conferences have become almost nonexistent." These articles were kept in notebooks with other materials regarding lobbying laws.

■■ A jury rationally could infer that Sawyer was cognizant of his ethical obligations in lobbying, knew of the public awareness of lobbying activity, and repeatedly gave hidden unlawful gifts and gratuities until he was publicly exposed. While not

---

17. Although allegations that Sawyer caused legislators to violate their statutory disclosure obligations were withdrawn by the government at trial, the obligation to disclose material information inheres in the legislator's general fiduciary duty to the public. *Silvano,* 812 F.2d at 758.

734

overwhelming, the combined evidence is sufficient to permit a reasonable jury to find, beyond a reasonable doubt, that Sawyer intended to deceive the public about his unlawful expenditures on legislators. *See United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir. 1992) (explaining that "juries are not required to examine the evidence in isolation, for 'individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.'") (quoting *Bourjaily v. United States*, 483 U.S. 171, 179–80, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987)), *cert. denied*, 506 U.S. 1063, 113 S.Ct. 1005, 122 L.Ed.2d 154 (1993); *United States v. Montminy*, 936 F.2d 626, 627–28 (1st Cir.1991).[18]

For the foregoing reasons, Sawyer's mail and wire fraud convictions must be vacated and remanded for a possible new trial.

### III.

### Travel Act Counts

◼ The government charged Sawyer with knowingly and wilfully travelling and causing others to travel in interstate commerce with the intent to promote, carry on and facilitate the promotion and carrying on of unlawful activity, to wit, illegal gratuities in violation of Mass. Gen. L. ch. 268A, § 3, in violation of 18 U.S.C. § 1952 (the "Travel Act").[19] The government asserted that Sawyer violated the Massachusetts gratuity statute subsequent to interstate travel to the following destinations: Tulsa, Oklahoma; Orlando, Florida; Savannah, Georgia; Scottsdale, Arizona; Key Largo, Florida; Charleston, South Carolina; Amelia Island, Florida; and Puerto Rico.

Sawyer argues that his Travel Act convictions must be reversed because: (1) the court erroneously instructed the jury on the gratuity statute; (2) the evidence was insufficient to establish the gratuity offenses; (3) the court barred him from presenting evidence crucial to his defense; and (4) the court improperly admitted summary evidence introduced by the government. Although we discuss and reject each of these arguments in turn, we nonetheless reverse his conviction on these counts because the district court's instructions on the meaning of "bribery," for the purposes of the Travel Act, were fatally flawed.

### A. Gratuity Statute Jury Instructions

Because the Travel Act convictions rely upon violations of the Massachusetts gratuity statute, we now address an additional state-law aspect of the gratuity statute about which the parties disagree.

The gratuity statute requires that the item of "substantial value" be given "for or be-

**18.** The government also presented evidence that Sawyer somehow concealed his expenditures on legislators from his Hancock superiors other than Hathaway. The government does not argue that this evidence can amount to the requisite deceptive conduct, nor did it rely on it to prove the intent to deceive. In any event, Sawyer's deceptive conduct toward Hancock, alone, cannot form the basis of this honest services fraud conviction. Rather, the alleged victims of the mail fraud—here, the state and the public—must be the ones deceived. Thus, in order for any deception of Hancock to form a part of the scheme to deprive the Commonwealth and her citizens of legislators' honest services, some showing that such conduct was connected to the defrauding of alleged victims is required. *See McEvoy Travel*, 904 F.2d at 794 & n. 13 (rejecting position that a scheme to defraud is established if the deception of one party causes deprivation to another); *Lifschultz Fast Freight, Inc. v. Consolidated Freightways Corp.*, 805 F.Supp. 1277 (D.S.C.1992) (requiring convergence of identity of injured and deceived), *aff'd on other*

grounds, 998 F.2d 1009 (4th Cir.) (Table), 1993 WL 241742, *cert. denied*, —— U.S. ——, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993).

**19.** The Travel Act proscribes travel in interstate commerce "with intent to ... promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." 18 U.S.C. § 1952(a). "Unlawful activity" is defined as, *inter alia*, "bribery ... in violation of the laws of the State in which committed or of the United States." 18 U.S.C. § 1952(b); *see United States v. Arruda*, 715 F.2d 671, 681 (1st Cir.1983). The district court instructed the jury that a violation of the gratuity statute constituted "unlawful" activity within the purview of the Travel Act, a view with which we agree to the extent that the court instructed that something of value was given in order to influence the performance of an official act. Sawyer does not dispute that a gratuity violation of this character is "bribery" for purposes of the Travel Act.

cause of any official act performed or to be performed." Mass. Gen. L. ch. 268A, § 3(a). An "official act" is defined as: "any decision or action in a particular matter or in the enactment of legislation." Mass. Gen. L. ch. 268A, § 1(h).[20] Here, Sawyer allegedly bestowed gratuities upon legislators who were members of the Insurance Committee. Thus, for purposes of this discussion, we proceed on the theory that the government had to prove that Sawyer gave the gratuities "for or because of . . . any decision or action in the enactment of legislation." *See* Mass. Gen. L. ch. 268A, §§ 3(a), 1(h).

■ The parties' interpretations of the gratuity statute differ with respect to the scope and character of the connection required between the gratuity and the official act. Sawyer contends that the gratuity must be linked to a specific, identifiable official act. The government argues that it is sufficient to prove that the gratuity would not have been given but for the legislator's ability to take official action favorable to Sawyer. In a pretrial ruling on Sawyer's motions to dismiss, the district court agreed with the government's interpretation, and instructed as such.[21]

No Massachusetts court decision has yet interpreted the operative "for or because of any official act" language in ch. 268A, § 3(a). To support their respective positions, the parties present differing argu-

ments regarding the statutory language, legislative history, comparable statutes, and State Ethics Commission rulings. We consider these sources separately.

### 1. Statutory Language

The gratuity statute prohibits the giving of gratuities "for or because of any official act performed or to be performed." Mass. Gen. L. ch. 268A, § 3. The statute does *not* read "for or because of the official's position." Rather, it forbids gratuities motivated by "any official act" and further defines, rather meticulously, "official act." *See* Mass. Gen. L. ch. 268A, §§ 1(h) & (k). Thus, on the face of the statute, it does not appear that the unlawfulness of the gratuity could be established by proof that it was motivated solely by the official's position. In other words, proof of the offense requires something more than a simple showing that "but for" the official's authority, the gratuity would not have been given.[22]

■ This observation, however, does not lead to the conclusion that the gratuity must be shown to be motivated by a specifically identified official act. As noted *supra*, a gratuity offense is essentially a bribery offense without proof of "corrupt intent." The concern behind the gratuity statute, like the bribery statute, is the potential undermining of official integrity. A gratuity does not compromise this integrity because of its pos-

**20.** A "particular matter" is further defined as:

any judicial or other proceeding, application, submission, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, decision, determination, finding, but excluding enactment of general legislation . . .

Mass. Gen. L. ch. 268A, § 1(k).

**21.** The court's jury instructions on this issue were as follows:

I instruct you that the government has to prove beyond a reasonable doubt that the defendant intended to influence the action of the legislator on any official matter which was pending before the legislator or which may, by law, have been brought before the legislator at some later time.

. . . .

I further instruct you that the government need not prove that the alleged gratuity was linked to a specific identifiable act. In other words, the government need not prove that the

gratuity was given as a quid pro quo; that is, in exchange for any one specific act performed or to be performed by the legislator. The government does not have to show that there was an agreement between the defendant and the legislator requiring the legislator to perform certain acts in exchange for the gratuity.

The government must prove, however, that the defendant gave the alleged gratuity to a legislator with the expectation that the legislator would use his influence on official matters in ways favorable to the defendant.

**22.** For example, if the parent of a student gives the school principal a gift of substantial value at the student's graduation, that alone would not constitute a gratuity offense, even though the parent would not have given the gift "but for" the principal's position. If, however, the gift was given under circumstances in which the principal had the discretion to decide whether or not the student would graduate, a gratuity offense might be found.

sible effect on the official's "position"; rather, the danger is in its ability to affect the official's performance of duties, *i.e.,* "official acts." It is not surprising, then, that the statute proscribes gratuities motivated by "official acts" rather than "official position."

Thus, the use of the term "official act" appears to ensure that the gratuity would be deemed unlawful only when the giving of an item of "substantial value" is linked to the official's performance of duties. The connection between the gratuity and the performance of official duties, however, does not necessarily require the identification of a specific official act, and we find nothing in the statutory language to require such a demonstration.

### 2. Legislative History

The gratuity statute was based, in part, upon a bill drafted by a 1962 Massachusetts Special Commission on Code of Ethics. *See* Report of the Special Commission on Code of Ethics, 1962 House Doc. No. 3650, p. 8. Nothing in the Commission's Report, however, assists us in resolving the instant question. It states only: "It should be noted that to constitute a criminal act, the giving or receiving of the item of such 'substantial value' must be 'for or because of' an official act." *Id.* at 11; *see Commonwealth v. Famigletti,* 4 Mass.App.Ct. 584, 354 N.E.2d 890, 893 (1976) (noting same language in the report). The Report neither parses out what these terms mean, nor gives examples of what was intended. From this we discern only that the Commission was concerned that "innocent" gifts to officials would not fall within the gratuity statute's purview.

The Commission's report does tell us that "[m]uch of the language of the proposed legislation is taken and adapted from [a proposed federal bribery/gratuity bill]." Report of Special Commission, *supra* at 8; *see Dutney,* 348 N.E.2d at 822 n. 16. As discussed below, however, the comparable federal gratuity statute, 18 U.S.C. § 201(c), is also unhelpful in resolving the question before us.

### 3. Comparable Statutes

In support of its position, the government relies on the Massachusetts Supreme Judicial Court's interpretation of a different statute in *Commonwealth v. Lapham,* 156 Mass. 480, 31 N.E. 638 (Mass.1892), and on federal cases interpreting the federal gratuity statute, 18 U.S.C. § 201(c).

*Lapham* involved a milk dealer who attempted to bribe a city milk inspector and was convicted under a statute punishing anyone who:

> corruptly gives, offers or promises to any executive, legislative … or judicial officer … any gift or gratuity whatever, with intent to influence his act, vote, opinion, decision, or judgment on any matter, question, cause, or proceeding, which may be then pending, or may by law come or be brought before him in his official capacity.

Mass. Pub. St. ch. 205, § 9 (Ch. 349 Revised May 21, 1891); *see Lapham,* 31 N.E. at 638–39. The milk dealer argued that the indictment was insufficient because it did not aver a particular matter to be influenced. *Id.* The Supreme Judicial Court disagreed, reasoning as follows:

> Nor is it necessary in an indictment under [ch. 205, § 9] to aver that the corrupt intention to influence the act, opinion, decision or judgment of the inspector was in relation to any specific and particular matter then pending before him, or which was then expected to come before him. It is enough to aver a corrupt intention so to influence him in any matter which may then be pending, or which may by law come or be brought before him. If for example an executive, legislative or judicial officer is bribed corruptly to favor a particular person in any and all matters affecting that person which may come before such officer, without specification or knowledge of the particular matters likely to come up, the statute is broad enough to include such a case. A narrower construction of a similar statute has been adopted in Alabama, but we cannot follow it. *Barefield v. State,* 14 Ala. 603 [1848].

*Id.* 31 N.E. at 639.

The difficulty with the government's reliance on *Lapham* is, of course, the fact that it involved a differently worded statute. The *Lapham* statute proscribes a corrupt gift to

influence an official act "on any matter ... which *may* be then pending or *may* by law come or be brought before him in his official capacity." Mass. Pub. St. ch. 205, § 9 (Ch. 349 Revised May 21, 1891) (emphasis added). In holding that an averment of a specific matter was not necessary, the *Lapham* court repeatedly used the word "may." *See, e.g., id.* ("It is enough to aver a corrupt intention so to influence him in any matter which *may* then be pending, or which *may* by law come or be brought before him.") (emphasis added).

The question is whether the absence of the word "may" in the present gratuity statute, *see* Mass. Gen. L. ch. 268A, §§ 3, 1(h) & (k), signifies, by negative implication, the requirement of a specific official act. The reasoning in *Lapham* does seem to indicate some relationship between the word "may" and the absence of a specificity requirement. We think, however, that it does not follow that the word "may" is the only manner in which to indicate that particular official acts need not be shown to establish a gratuity offense.

The present statute proscribes a gift "for or because of *any* official act performed or to be performed,"[23] and further defines "official act" as "*any* decision or action in a particular matter or in the enactment of legislation." Mass. Gen. L. ch. 268A, §§ 3(a), 1(h) (emphasis added). Use of the broad term "any" is consistent with a legislative intent to proscribe gifts motivated by unidentified official acts. Most importantly, given the reasoning set forth in *Lapham*, we think that if the Massachusetts Legislature had wanted to drastically narrow the scope of the gratuity offense by requiring specifically identified official acts, it would have spoken more clearly than it has. In the end, the *Lapham* case supports the conclusion that a gratuity offense may be established without proof that a specific official act was the motivation for the gratuity.

The government also relies on cases interpreting the similarly worded federal gratuity statute, 18 U.S.C. § 201(c),[24] that indicate that a conviction under that statute does not require a showing that the gratuity was linked to a specific official act. *See, e.g., United States v. Bustamante,* 45 F.3d 933, 940 (5th Cir.) ("it is sufficient for the government to show that the defendant was given the gratuity simply because he held public office"), *cert. denied,* —— U.S. ——, 116 S.Ct. 473, 133 L.Ed.2d 402 (1995); *United States v. Niederberger,* 580 F.2d 63, 68–69 (3d Cir.), *cert. denied,* 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978); *United States v. Standefer,* 610 F.2d 1076, 1080 (3d Cir.1979) (en banc), *aff'd on other grounds,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). The government reasons that because much of the Massachusetts gratuity statute's language was based upon the federal statute, *see Dutney,* 348 N.E.2d at 822 n. 16, and because some federal cases hold that specific acts need not be shown, a similar interpretation of the state law should obtain.

Reliance on those cases, however, is undermined by the fact that the First Circuit has expressly reserved ruling on the question of whether or not a gratuity prosecution under

---

23. The phrase "performed or to be performed" affords temporal flexibility between the gratuity and any motivating official act. Mass. Gen. L. ch 268A § 3(a); *Dutney,* 348 N.E.2d at 821 n. 14. This temporal flexibility is also present in the *Lapham* statute ("may then be pending or which may by law come or be brought before him"), ch. 205, § 9 (1891), as well as the federal gratuity statute ("may at any time be pending, or which may by law be brought before [an official]") noted *infra.* 18 U.S.C. § 201(a)(3). In our view, and contrary to the district court, while the language affording temporal flexibility is consistent with the absence of an official-act specificity requirement, it does not compel that result. *See Sawyer,* 878 F.Supp. at 287.

24. The federal gratuity statute, 18 U.S.C. § 201(c), provides, in pertinent part:

> Whoever—[] otherwise than as provided by law for the proper discharge of official duty—[] directly or indirectly gives, offers, or promises anything of value to any public official ... for or because of any official act performed or to be performed by such public official ... shall be [punished].

The term "official act" is further defined in 18 U.S.C. § 201(a)(3) as:

> any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

the federal statute requires proof of a "causal relation to any 'specific, identifiable act.'" *United States v. Previte,* 648 F.2d 73, 82 n. 8 (1st Cir.1981) (quoting *Niederberger,* 580 F.2d at 68–69). Sawyer, on the other hand, cites no federal gratuity cases (or state gratuity cases, for that matter) squarely holding that specific acts *must* be shown; although, he does cite cases in which specific official acts *were* shown, *see e.g., United States v. Biaggi,* 853 F.2d 89, 99–100 (2d Cir.1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989); *United States v. Brewster,* 506 F.2d 62, 77–78 (D.C.Cir.1974). This is not the proper case for us to decide the federal issue. Thus, we conclude that it would be inappropriate to take any guidance here from cases interpreting the federal gratuity statute.

### 4. State Ethics Commission Pronouncements

The Massachusetts State Ethics Commission is the primary civil enforcement agency for violations of the gratuity statute. Mass. Gen. L. ch. 268B, § 3(i). The Ethics Commission has the power and duty to investigate alleged gratuity offenses, initiate appropriate adjudicatory proceedings, and order civil penalties if it concludes that a violation has occurred. *Id.* § 4. Upon the petition of any party, a final action of the Ethics Commission is subject to review by the Massachusetts superior court, which may enforce, modify or set aside the order. *Id.* § 4(k).

The Ethics Commission has repeatedly interpreted the gratuity statute as forbidding gifts motivated generally by the official's authority to act favorably for the donor. *See In Re Charles F. Flaherty,* 1990 SEC 59 (Disposition Agreement) ("'All that is required to bring [the gratuity statute] into play is a nexus between the motivation for the gift and the employee's public duties'" (quoting *In Re George A. Michael,* 1981 SEC 59, 68)); SEC Commission Advisory No. 8 "Free Passes" (May 14, 1985) (noting that "even in the absence of any specifically identifiable matter that was, is or soon will be pending before the official, [the gratuity statute] may apply") (citing *United States v.*

*Standefer,* 452 F.Supp. 1178, 1183 (W.D.Pa. 1978)).

We give the Ethics Commission's interpretation some deference. *See Olszewski v. Berube,* 3 Mass. L. Rptr. 297, 1995 WL 808889 (Mass.Super.No. 922666) (Jan. 27, 1995) at *2 (stating that although the Ethics Commission's "decision on matters within its competence is to be given great weight, the courts are the final interpreter") (citing *Finkelstein v. Board of Reg. in Optometry,* 370 Mass. 476, 349 N.E.2d 346, 348 (1976)). That deference, however, is tempered not only by the fact that no Massachusetts court has passed on the Ethics Commission's interpretation, but also because this is a criminal case and the Ethics Commission is charged only with civil enforcement. The Commission may very well have valid reasons for adopting a broad, prophylactic interpretation of the statute in its civil dispositions of individual transgressions; its interpretation is easier to prove and the offender is more likely to settle with the Commission if she does not have to admit to more egregious wrongdoing.

Nonetheless, we note that the Ethics Commission's interpretation of the gratuity statute has been left undisturbed by the Massachusetts Legislature, and its interpretation is not "arbitrary, unreasonable or inconsistent" with the statute. *Finkelstein,* 349 N.E.2d at 348. Thus, the Ethics Commission's opinion on the matter further supports the conclusion that a specific official act need not be identified in a gratuity offense.

### 5. Conclusion: Jury Instructions

The absence of a Massachusetts court decision on this issue is troubling. We have carefully considered, however, all of the authority and arguments on Sawyer's behalf, and none of them is availing. We also take note of the fact that Sawyer does not cite a single gratuity case, either federal or state (and we have found none), holding that a specific official act must be linked to the unlawful gratuity. Thus, we conclude that the Massachusetts gratuity statute does not require proof that the offender gave the item of "substantial value" because of a specifically identified official act. Of course, the iden-

tification of certain official acts in relation to the gratuity might make a gratuity offense easier to prove, and we suspect that most cases will include such proof although it is unnecessary.

### B. Sufficiency of the Evidence

In cases such as this one, it becomes clear why particular official acts need not be shown. The evidence at trial showed that Sawyer gave items (that could be found to be of "substantial value") to Massachusetts legislators who had the ability to take official action favorable to Hancock, and that those gifts effectively ceased after the legislators left office. While the government did not detail all of the legislators' acts that were favorable to Hancock, the government did show that Sawyer had a long-term, ongoing interest in the official acts of the legislators, and that he knew his gratuities were unlawful. From this evidence, the jury could rationally infer that the gratuities were motivated by the legislators' performance of official duties, *i.e.*, that they were given "for or because of any official act," within the meaning of the Massachusetts gratuity statute, Mass. Gen. L. ch. 268A, § 3.

### C. Evidentiary Issues

#### 1. Exclusion of Skrine Memorandum

Sawyer contends that the court unduly restricted the presentation of evidence that he entertained lawmakers solely out of friendship and goodwill and he believed that this did not violate the gratuity statute.[25] Specifically, he appeals the court's exclusion of a document, written by Bruce Skrine, memorializing Skrine's interview with Sawyer after the Boston Globe's inquiry into the

Puerto Rico trip. That document reflects Sawyer's assertion that such entertainment, while perhaps excessive in Puerto Rico, "was commonly done and that, [the] legislators were all friends of his and that they were not in anyway [sic] discussing legislation or lobbying."

At trial, Sawyer did not attempt to offer this document to prove his state of mind with respect to his expenditures. In fact, he indicated to the court that its admission was not necessary because he had already elicited the desired testimony from Skrine. Later on, however, pointing out that the document did not mention that he entertained to "gain access" to legislators, Sawyer offered it to impeach Skrine. The court did not permit its admission on that basis, but it did allow Sawyer to cross-examine Skrine on that very issue. Because Sawyer did not offer the document for the purpose he now asserts on appeal, he has forfeited this claim. *See United States v. Whiting,* 28 F.3d 1296, 1302 (1st Cir.) (explaining that evidence must have been offered for the purpose asserted on appeal to preserve issue) (citing *Tate v. Robbins & Myers, Inc.,* 790 F.2d 10, 12 (1st Cir.1986)), *cert. denied,* 115 S.Ct. 378, 498, 499, 532, 130 L.Ed.2d 328, 408, 435 (1994). But because the issue may again arise on remand, we further hold that because Sawyer was able to obtain the desired testimony on the issue he now asserts, we would find no abuse of discretion in its exclusion. *See United States v. Newman,* 49 F.3d 1, 5–6 (1st Cir.1995) (reviewing court's exclusion of evidence for abuse of discretion).[26]

#### 2. Admission of Computer Summaries

Sawyer assigns reversible error to the district court's admission of five charts,

---

**25.** Sawyer also raises arguments as to his good faith conduct *vis a vis* the gift statute, which is not relevant to the Travel Act counts. Such contentions would be relevant to the mail and wire fraud counts, which we have reversed. We leave the good faith issues surrounding the gift statute (which are dependent on the evidence adduced at trial) for the district court to resolve on remand, should the government choose to retry those counts.

**26.** Sawyer also argues that the court erroneously refused to instruct the jury on his defense-theory

that it was his belief that if expenditures were permitted under the lobbying-disclosure obligations set forth in Mass. Gen. L. ch. 3, then those expenditures (although they had to be disclosed) were also allowed under the gratuity statute. Upon review of the record, we agree with the district court that this instruction was unwarranted because Sawyer did not present any evidence that, during the indictment period, he actually believed that his expenditures were permitted by the lobbying-disclosure laws.

Exhibits 1, 1Q, 1R, 1S and 1T, proffered by the government. Exhibit 1 was a forty-nine page computer printout summarizing 612 expenditures, occurring between January 1, 1986 and March 31, 1993, that were recorded in Sawyer's appointment calendars, expense records and other admitted documents. Exhibits 1Q, 1R and 1S are extracts of Exhibit 1 that isolate the expenditures for Representatives Woodward, Howarth and Emilio. Exhibit 1T contrasts the amount spent on those three Representatives while they were members of the Legislature with the amount spent on them after they left that office. Sawyer contends that these charts were admitted on an insufficient foundation and that they were misleading, argumentative and prejudicial.

 Federal Rule of Evidence 1006 provides, in pertinent part:

> The contents of voluminous writings ... which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals or duplicates shall be made available for examination or copying, or both, by [the other party].

Before admitting such evidentiary presentations, the court must first ensure that each is grounded upon a "sufficient factual basis," *i.e.*, upon independently established evidence in the record, and that "possible prejudice or confusion does not outweigh their usefulness in clarifying the evidence." *United States v. Drougas*, 748 F.2d 8, 25 (1st Cir.1984) (citing J. Weinstein & M. Berger, *Weinstein's Evidence* § 1006 (1983)); *see United States v. Nivica*, 887 F.2d 1110, 1125 (1st Cir.1989), *cert. denied*, 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990); *United States v. Sorrentino*, 726 F.2d 876, 884 (1st Cir.1984). When a court admits such summaries,

> [c]are must be taken to insure that summaries accurately reflect the contents of the underlying documents and do not function as pedagogical devices that unfairly emphasize part of the proponent's proof or create the impression that disputed facts have been conclusively established or that inferences have been directly proved.

*Drougas*, 748 F.2d at 25 (citing *Weinstein's Evidence, supra* § 1006). We review the ad-

mission of summaries for abuse of discretion. *Nivica*, 887 F.2d at 1126.

Sawyer contends that the district court improperly admitted the summaries because they did not include evidence of his expenditures on legislators before and after the time period covered in the summaries, or his expenditures of personal funds. He argues that this was unduly misleading because it created a "false impression" as to the date the alleged conspiracy began, and falsely implied that the expenditures ended after the three named representatives left office. We disagree.

The summaries were based on evidence that was already independently admitted and that was relevant to Sawyer's questionable expenditures during the indictment period. Sawyer had the opportunity, on cross-examination, to place the summaries in context with his total financial activity. *See Nivica*, 887 F.2d at 1125 (concluding that argument that summaries failed to, *inter alia*, reflect "total financial activity" "affect[s] weight rather than the admissibility"). On the matters to which Sawyer assigns undue prejudice, he had ample opportunity to explore them on cross-examination, which he did. He also could have offered his own contrary evidence, including his own summary (which he did not do). As we stated in *Nivica*, 887 F.2d at 1126:

> So long as the government, exercising due diligence, collects whatever records are reasonably available and succeeds in introducing them, it may be permitted (subject, of course, to relevancy and perscrutation under Fed.R.Evid. 403) to summarize the data it has managed to obtain. If defendants possessed exculpatory records not in the government's files, they could have offered them at trial or prepared their own summary. By the same token, if there were gaps in the charts, the defense ... had every opportunity to exploit them. In the last analysis, completeness of the underlying records was for the jury.

We conclude that the summaries were based on a sufficient foundation and that the court did not abuse its discretion in admitting them.

### D. Protective Instruction

Having rejected all of Sawyer's arguments, we think there is one flaw in the proceedings that does have to be addressed in the interests of justice and especially in light of the possibility of future prosecutions of this kind. Our concern arises from the close relationship between lobbying activities that are lawful from the standpoint of federal law, even if deplorable, and associated or slightly more extreme versions of such conduct that can constitute federal violations. The problem is, in some respects, novel; the reason for its novelty is that it appears that prosecutions on facts like these have not generally been brought.

A review of pre-*McNally* theft of honest services cases and of bribery and gratuity cases under the counterpart federal statute, 18 U.S.C. § 201, indicates, as we have already noted, that most involved straightforward corruption—most often, *quid pro quo* bribery or blatant conflict of interest. While the issue in those cases was typically whether or not the conduct actually occurred, in most of them the alleged conduct was blatantly illegal. This case is distinct in that the conduct itself may not be very different, except possibly in degree, from the kind of routine cultivation of friendship in a lobbying context that, while arguably very unattractive, is not "bribery" within the meaning of the Travel Act.

The practice of using hospitality, including lavish hospitality, to cultivate business or political relationships is longstanding and pervasive. The government does not argue, and we do not believe, that payments for entertainment, lodging, golf, sports events, and the like would constitute violations of the Travel Act (or the mail and wire fraud statutes) if the aim of the lobbyist were simply to cultivate a business or political "friendship" with the legislator. It may well be that all such hospitality should be flatly prohibited by law, but if Sawyer had this limited intent—to cultivate friendship rather than to influence an official act—the federal statutes here involved would not be violated.[27]

The charge to the jury in this case followed the conventional formula for prosecutions involving political corruption. But where the difference between lawful and unlawful turns primarily on intent, and the lawful conduct is itself most unattractive, we think the jury needs to be told specifically that the defendant has not violated the bribery component of the Travel Act (or committed honest services fraud) if his intent was limited to the cultivation of business or political friendship. Only if instead or in addition, there is an intent to cause the recipient to alter her official acts may the jury find a theft of honest services or the bribery predicate of the Travel Act. Absent some explicit explanation of this kind, the conventional charge will be slanted in favor of conviction.[28]

In reaching this conclusion, we intend no criticism of the able district judge who was coping with a somewhat novel foray by the government. But where, as here, the line between the merely unattractive and actually criminal conduct is blurred, the court must take pains to explain the difference to the jury. The Second Circuit took this same view in a closely related context, saying: "When an elected official who has received campaign contributions is charged with extortion and with receiving bribes, the charge must carefully focus the jury's attention on the difference between lawful political contri-

---

27. *See, e.g., United States v. Arthur,* 544 F.2d 730 (4th Cir.1976); *United States v. Brewster,* 506 F.2d 62 (D.C.Cir.1974); *cf. Dukehart–Hughes Tractor & Equipment Co. v. United States,* 169 Ct.Cl. 522, 341 F.2d 613 (1965).

28. It is not clear whether the government would contend that a gratuity violation involving only a reward for an official act (even without any intent to influence any future official act) could constitute "bribery" for purposes of the Travel Act. We are extremely doubtful whether this would constitute bribery for these purposes and do not read the Second Circuit as ruling on this point in *United States v. Biaggi,* 853 F.2d 89, 100–02 (2d Cir.1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989). The fact that a gratuity violation involving an intent to influence is essentially bribery, *see* 853 F.2d at 101, does not mean that every possible application of a gratuity statute fits the rubric. In all events, if the government intends to rely upon an intent to influence theory, our protective instruction would be required here.

butions and unlawful extortionate payments and bribes." *United States v. Biaggi*, 909 F.2d 662, 695–96 (2d Cir.1990), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991).

Having concluded that the jury charge was mistaken, we must consider whether Sawyer should get the benefit of the error. This is a close call. On the one hand, Sawyer did not explicitly ask for the sort of language we think appropriate. Ordinarily, the failure to make an explicit objection requires the defendant to satisfy the plain error test of *United States v. Olano*, 507 U.S. 725, 732–34, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993). On the other hand, a number of Sawyer's objections were closely related in that they sought in several different ways—which we do not accept—to protect one engaged in good faith lobbying from prosecution.

On balance, we think that the Travel Act counts, as well as the mail and wire fraud convictions, ought to be reversed and retried under proper instructions. Although the evidence here would be adequate to infer improper intent, the issue is close and an explanatory instruction could well affect the outcome. Also, the fact that the prosecution was novel makes us look more tolerantly on Sawyer's failure to articulate precisely the shape of the necessary protective instruction.

Apart from the expense of retrial, the government has very little to complain about in this result. We have agreed that the Massachusetts gratuity statute does not require the government to link the gratuity to a specific official act. We have also found that the evidence here is sufficient to convict (although we can imagine reasonable people thinking otherwise). And while we are somewhat concerned about the lack of fair warning of a prosecution such as this one, we see no legal basis for precluding the government from embarking on what is in practical terms an expansive reading of the federal statutes. Against this backdrop, we think it even more important that Sawyer get the benefit of the few protections that remain.

## IV.

### Conspiracy Count

Sawyer was also convicted, under 18 U.S.C. § 371, of one count of conspiracy to commit mail and wire fraud, and to violate the Travel Act. The court instructed the jury that it could find Sawyer guilty of conspiracy if it found, beyond a reasonable doubt, that he conspired with his supervisor, Hathaway, to commit any one of the three objects, *i.e.*, the substantive offenses as charged. Because all of the objects—mail and wire fraud and the Travel Act violations—were erroneously charged and instructed, the conspiracy convictions must be reversed as well.

Retrial is not precluded if the evidence is sufficient to prove the existence of a conspiracy, Sawyer's knowledge of and voluntary participation in it, and an overt act in furtherance of it. *See United States v. Yefsky*, 994 F.2d 885, 890 (1st Cir.1993); *see generally, United States v. Frankhauser*, 80 F.3d 641, 653 (1st Cir.1996). The agreement need not be explicit; a tacit agreement will suffice. *Direct Sales Co. v. United States*, 319 U.S. 703, 712–13, 63 S.Ct. 1265, 1269–70, 87 L.Ed. 1674 (1943). To establish Sawyer's voluntary participation in the conspiracy, the evidence must establish both his intent to agree and his intent to effectuate the object of the conspiracy. *Yefsky*, 994 F.2d at 890; *see also United States v. Piper*, 35 F.3d 611, 615 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1118, 130 L.Ed.2d 1082 (1995). Neither the agreement nor Sawyer's participation in it need be proven with direct evidence. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *see Frankhauser*, 80 F.3d at 653.

Sawyer contends that the evidence was insufficient to prove that: (1) he and Hathaway knowingly agreed to commit the offenses; (2) he voluntarily participated in such an agreement; and (3) either of them performed any overt act in furtherance of the conspiracy. We disagree. The government presented evidence that Hathaway supervised Sawyer in his lobbying activities. From Hathaway's receipt of many of the same legal memoranda and Massachusetts Ethics Commission rulings that Sawyer re-

ceived, a jury could rationally infer that Hathaway (an attorney, like Sawyer) knew and understood the ethical obligations in lobbying. Some of these documents had both Sawyer's and Hathaway's names on them; thus, a jury could find that Hathaway and Sawyer knew of each other's knowledge of the lobbying laws.[29] Sawyer turned to Hathaway, his supervisor, for approval of his expense vouchers. Hathaway performed this responsibility throughout the indictment period, and in so doing was the only person (other than Sawyer) to have detailed knowledge of the specific legislators, often members of the Insurance Committee, who received the gifts and gratuities.

Thus, the jury could reasonably infer that Hathaway and Sawyer both knew that the expenditures were unlawful, and from this, that the reason for the repeated illegal gifts and gratuities to key legislators was to secretly influence legislative action. Given the evidence of the repeated submission and approval of the expense vouchers, a jury could rationally find that Hathaway and Sawyer agreed, at least tacitly, to the pattern of unlawful conduct. Finally, the jury could also infer that Sawyer and Hathaway knew that the mails and wires would be used to facilitate the entertainment and/or reimbursement (*e.g.*, the mailing of bills related to, and the making of telephone calls to arrange, the entertainment), and that interstate travel in connection with the entertainment (*e.g.*, reimbursement of out-of-state golf) would or had to occur. The overt acts charged in the indictment included Sawyer's giving of illegal gratuities and Hathaway's approval and authorization of reimbursement, and the evidence was sufficient to establish those acts.

Thus, despite the underlying legal error, the evidence was sufficient to establish the conspiracy offense and a new trial on this count is allowable should the government so choose.

29. For example, one trial exhibit was a memorandum from Sawyer to Hathaway, enclosing a 1990 State Ethics Commission Disposition Agreement with House Majority Leader Charles Flaherty. That agreement concerned the giving of Celtics basketball game tickets to Representative Flaherty by a person with interests before him, and how that might violate the Massachu-

### V.

### Conclusion

Sawyer raises a number of other issues that we have reviewed, find to be without merit, and that warrant no further discussion.

For the foregoing reasons, we *vacate* the mail fraud, wire fraud, Travel Act and conspiracy convictions, and *remand* for proceedings consistent with this opinion.

setts gratuity statute, Mass. Gen. L. ch. 268A, § 3. Sawyer and Hathaway discussed the Flaherty Disposition during a meeting with Bruce Skrine (vice president, counsel and secretary for Hancock) in which Sawyer and Hathaway expressed concern about compliance with state ethics law in planning for the 1993 Boston Marathon brunch.